ZANDSTRA v STEWART

OPINION OF THE COURT

1. FRAUD—EVIDENCE—FINDINGS OF FACT—APPEAL AND ERROR.

A trial court's findings of fact rejecting plaintiffs' allegation of fraud were clearly erroneous where the plaintiffs offered into evidence: (1) that defendants had advertised their dry-cleaning establishment as the only one in town, and (2) the testimony of two disinterested witnesses that the defendants knew a competitor would soon be opening, while defendants' claim of lack of knowledge of such competition prior to sale of the business was supported only by the testimony of the obviously interested defendants.

2. FRAUD—MISREPRESENTATIONS—MEASURE OF DAMAGES.

The measure of damages in a suit by a vendee defrauded when he entered into a contract of sale of a business because of misrepresentation of material facts is the difference between the actual value of the property at the time of making the contract and the value it would have possessed had the representations been true.

DISSENT BY J. H. GILLIS, P. J.

3. FRAUD—VENDOR AND PURCHASER—DUTY TO INFORM—RUMORS.

*A vendor, after advertising his dry-cleaning business as the only one in town, had no duty to inform the prospective purchaser of rumors of impending competition where the rumors were mere speculation with little or no basis in fact.*

4. APPEAL AND ERROR—FINDINGS OF FACT.

*It is not the function of the Court of Appeals to substitute its judgment for that of the trial court on issues of fact unless the trial court's findings are contrary to the clear preponderance of the evidence.*

REFERENCES FOR POINTS IN HEADNOTES

[1, 4] 37 Am Jur 2d, Fraud and Deceit §§ 486, 487.

[2] 37 Am Jur 2d, Fraud and Deceit § 342.

[3] 37 Am Jur 2d, Fraud and Deceit § 146 *et seq.*

Appeal from Kent, John T. Letts, J. Submitted Division 3 April 11, 1972, at Grand Rapids. (Docket No. 12077.) Decided September 27, 1972.

Complaint by Gerrit Zandstra and Sena Zandstra against Billie G. Stewart and Evelyn J. Stewart for damages sustained because of misrepresentations inducing purchase of a dry-cleaning business. Judgment for defendants. Plaintiffs appeal. Reversed and remanded with instructions.

*Russell & Ward,* for plaintiffs.

*Thomas D. Anderson, Jr.,* for defendants.

Before: J. H. GILLIS, P. J., and R. B. BURNS and DANHOF, JJ.

R. B. BURNS, J. In this case plaintiff-vendees accuse the defendant-vendors of fraud in connection with the sale of a dry-cleaning business. Plaintiffs' allegations of fraud are: (1) that defendants never fulfilled their promise to instruct plaintiffs on how to run a dry-cleaning business; (2) that the machinery in the dry-cleaning establishment was not in good condition as warranted; (3) that defendants misrepresented weekly gross revenues from the business; (4) that defendants represented that the dry-cleaning establishment was the only one in town when in fact defendants had knowledge that a competitor intended to open a business in town. The findings of fact made by the trial court in its rejection of plaintiffs' first three allegations of fraud are not "clearly erroneous",[1] and support its decision. However, its findings of fact made in connection with the fourth allegation of fraud are clearly erroneous.

[1] See GCR 1963, 517.

The court found that defendants obtained knowledge of the presence of a competitor dry cleaner in the community after the final closing with plaintiffs had taken place. This finding is supported only by the testimony of the obviously interested defendants. In opposition to this evidence stands the fact that defendants advertised their dry-cleaning establishment as the only one in town and the testimony of two disinterested witnesses that the defendants knew, prior to the sale, that a competitor would soon be opening its business.

The elements of fraud set out in *A & A Asphalt Paving Co v Pontiac Speedway, Inc,* 363 Mich 634, 639 (1961), are present in the instant case. Defendants falsely represented to plaintiffs that there was and would be no competition for them in the community while at the same time having knowledge of the eventuality of such competition.

Plaintiffs are entitled to damages for fraud based upon the difference between the actual value of the property at the time of making the contract and the value that it would have possessed if the representations made had been true. See *D'Alessandro v Vander Hooning,* 365 Mich 66, 73 (1961).

Reversed and remanded for determination of damages. Costs to plaintiffs.

Danhof, J., concurred.

J. H. Gillis, P. J. *(dissenting).* The issue in the trial court was whether defendants had a duty to inform the plaintiffs of the rumors of impending competition in Cedar Springs. Determination of that issue depended entirely upon a fact finding as to the substance of those rumors. Clearly, if the rumors were mere speculation with little or no basis in fact, defendants were not bound to repeat them to prospective purchasers.

The trial court expressed its finding succinctly:

"The court is convinced that there was pure speculation without a scintilla of evidence that a competitor would move in."

The majority takes issue with this finding, convinced that it is supported only by the testimony of the "obviously interested defendants". They would give greater weight to the testimony of "two disinterested witnesses that the defendants knew, prior to the sale, that a competitor would soon be opening its business".

The testimony of these very witnesses, analyzed closely, far from proving a factual basis for the rumors, graphically illustrates that the basis of the rumors was not fact, but the witnesses' own speculation and elaboration on events which had occurred.

The witnesses in question were Mr. Sherwood and Mrs. Goller, part-time employees of the defendants. Mrs. Goller was an employee of the plaintiffs when she testified at the trial.

Mr. Sherwood was asked where he had heard the rumor that there would be a new dry cleaner. He answered,

"Well, from people coming in town, plus about two weeks before that the man that bought the place [Mr. Harmon, the alleged competitor] come in and was talking to me. He was *either going to buy this place or buy another place and reopen it,* either one or the other, he was going to do it. * * * He said, 'I am interested in the place, *either buy it or build a different place.'* " (Emphasis supplied.)

On this uncertain statement of intention to do one thing or another, employees of the defendants

based the "fact" of Mr. Harmon's certain intention to start a competing business.

Mrs. Goller's testimony evidences the process whereby the transformation from possibility to certainty took place:

"*A.* Yes. They knew and we all knew that there was another cleaner in Cedar Springs.

"*Q.* There was another?

"*A.* There was another cleaner. He had come in to the cleaners and talked to Mr. Sherwood, *said he was going to start.*

"*Q.* He had talked to Mr. Sherwood?

"*A.* Right. In a very small town you know, Cedar Springs, it is just like 'Peyton Place'.

"*Q.* Did he talk to you?

"*A.* Did he talk to me?

"*Q.* Yes.

"*A.* No, he did not.

"*Q.* How do you know when he talked to Mr. Sherwood?

"*A.* How did I know?

"*Q.* Yes.

"*A.* Mr. Sherwood told me.

"*Q.* But your testimony here is just what Mr. Sherwood told you?

"*A.* Right. *He testified to the same, I believe, under oath.*

"*Q.* So your testimony is just based on knowledge Mr. Sherwood had?

"*A.* We knew that someone was fixing up this place on the corner on Main Street. * * *

"*Q.* What kind of activity was going on?

"*A.* Someone was in there doing carpenter work or some kind of work in there.

"*Q.* You actually looked at it yourself?

"*A.* I got to the grocery store right across the street where you could look right to the building.

"*Q.* What were they doing?

"*A.* I don't recall exactly what they were doing but

we all knew. This was common knowledge in the dry cleaners." (Emphasis supplied.)

No doubt Mrs. Goller believed herself to be accurately restating what she had heard from Mr. Sherwood; her error in this regard is plain in the emphasized portions of her testimony. Mrs. Goller's certainty was thus based on her misunderstanding of what had been said to Mr. Sherwood, coupled with her inconclusive observations of "carpenter work or some kind of work" in the "place on the corner on Main Street". Perhaps her most accurate, if unintended, observation about the origins and reliability of the rumor in question was: " * * * Cedar Springs, it is just like 'Peyton Place' ".

It was the duty of the trial judge to test the accuracy of the witnesses' conclusions ("there was another cleaner in Cedar Springs") by examining the basis therefor (the competitor was either going to buy it or build a different place) (Mr. Sherwood told me) in light of the relevant circumstances. There was uncontradicted testimony that Mr. Harmon made an offer to defendants to buy their cleaners at about the same time that defendants accepted plaintiffs' offer. That circumstance supports the conclusion that Mr. Harmon had not, up to the time of sale, decided to start a competing business, or he would not have been attempting to buy defendants' business. It is also consistent with Mr. Sherwood's testimony that the "competitor" was at least as interested in buying an existing business as he was in starting a new one.

It seems a fair statement to say that the rumors had their basis as much in the imaginations of the witnesses as in fact.

There remains to be considered the testimony of the two witnesses recalling a conversation had

among themselves and the defendant Mr. Stewart, wherein Mr. Stewart allegedly ordered the employees to conceal the existence of the competitor from prospective purchasers.

The conversation, according to Mr. Sherwood:

"*A.* Well, we were talking. We heard rumors a new dry cleaner was coming to town.

"*Q.* Mr. Stewart there then?

"*A.* Mr. Stewart come in. We asked him. He said, yes, there was going to be one there.

"*Q.* What else did he say?

"*A.* He said we shouldn't say anything to any person who was going to buy the business.

\* \* \*

"*A.* That we shouldn't say anything about the new dry cleaner coming in town."

He could not recall when this conversation took place, nor whether it was before or after he had talked to Mr. Harmon about his plans.

The same conversation, according to Mrs. Goller:

"*A.* Well, we had talked, as I say, it was constant chatter that there was another cleaner coming in then, and Mr. Stewart had come in and we had mentioned to him this, and he said, 'I am bringing in prospective buyers and I do not want you to say anything to them because they will have to deal with this themselves after they buy.' And this was maybe not his exact words but this was as close as I can remember. \* \* \* Like I said, we said, 'What would they do with another cleaner in this town, the size of this town?' They said, 'That's their worry.'"

In light of the circumstances, Mr. Stewart's request to his chattering employees to refrain from their rumor-mongering in front of prospective purchasers was reasonable, and did not amount to a fraudulent concealment.

So the trial judge found, and his findings are not to be set aside on appeal unless clearly erroneous. The majority has ignored the clear direction of the court rule that "[i]n the application of this principle regard shall be given to the special opportunity of the trial court to judge the credibility of those witnesses who appeared before it". GCR 1963, 517.1.

It may well be that the majority would have decided differently had they been the trier of fact below. Nevertheless, it is not the function of the appellate court to substitute its judgment for that of the trial court on issues of fact.

Our function was clearly expressed by the Supreme Court in an oft-quoted passage of the *Kevreson* case:

"The judge's factual conclusion in such regard is sharply disputed by what seems to be persuasive testimony, enough to impel observation that plaintiffs' proof appears—in print—as being weaker than that which defendant adduced *contra.* In short, had the responsibility for original determination of such factual issue been cast upon this Court rather than upon the trial judge, it is not unlikely that we might have agreed with defendant-appellant that plaintiffs did not sustain their affirmative burden.

"All this, however, departs from the appellate function. The trial judge, supported legally by testimony he had personally heard and seen delivered, concluded as above. We in turn have read only a sterile transcript of the pro and con testimony. In consequence the judge's conclusion, reached upon pivotal testimony believed by him, forecloses further appellate inquiry. There is no ground, withal, upon which we may say that the judge's findings and therefore his judgment are contrary to the clear preponderance of the evidence." *Kevreson v Michigan Consolidated Gas Co,* 374 Mich 465, 473–474 (1965).

Even if the testimony discussed admits of an-

other, more sinister, interpretation, it cannot be said that the evidence preponderates against the more innocent construction put upon it by the trial judge. That being so, we are without ground to say that "the judge's findings and therefore his judgment are contrary to the clear preponderance of the evidence".

I would affirm.