KEVRESON *v.* MICHIGAN CONSOLIDATED GAS COMPANY.

1. APPEAL AND ERROR—NONJURY CASES—CLEAR PREPONDERANCE OF EVIDENCE.

Nonjury actions at law are not reviewed by the Supreme Court *de novo* and it takes such a glaring error by the trial court to afford occasion for reversal on a finding of fact in such a case that it can be said that the judgment, as a matter of law, is contrary to the clear preponderance of the evidence, the status of the Supreme Court as a reviewing court not having been affected by change in wording from former court rule (Court Rule No 64 [1945]; GCR 1963, 810).

2. GAS—BOILER EXPLOSION—PROXIMATE CAUSE—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE.

Finding by trial judge, in nonjury action against gas company for damages resulting from gas explosions, that action of defendant's employees in operating a boiler which was not in operable condition, so posted according to plaintiff's testimony and obviously so according to testimony of defendant's em-

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error § 839 *et seq.*
[2] 38 Am Jur, Negligence § 67 *et seq.*
[3] 37 Am Jur, Motions, Rules, and Orders § 8.

ployees, was negligence and proximately caused the damage sustained by plaintiff *held*, to be correct, since such action taken under the circumstances as constituted an intervening cause which insulated plaintiff from guilt of negligent responsibility by reason of having 2 boilers connected with a stack of insufficient size to handle both at the same time.

3. Negligence—Contributory Negligence—Question for Trier of Fact—Preponderance of Evidence.

Motion by defendant, made after entry of judgment, for leave to plead contributory negligence as an affirmative defense should have been granted as the issue had been impliedly tried, the disposition of such issue by the trial court in finding that even if plaintiff were guilty of negligence, defendant's negligence was subsequent and the determination on the issue of contributory negligence, one of fact, was not against the clear preponderance of the evidence (GCR 1963, 118.3).

Appeal from Wayne; Bowles (George E.), J. Submitted November 3, 1964. (Calendar No. 41, Docket No. 50,543.) Decided February 2, 1965.

Case by Milton L. Kevreson, doing business as Uptown Radio Company, and 6 subrogated insurance companies against Michigan Consolidated Gas Company, a Michigan corporation, for damages resulting from gas explosions. Judgment for plaintiffs. Defendant appeals. Affirmed.

*Earl D. Ross* and *George Menendez,* for plaintiffs.

*A. D. Ruegsegger* and *Cedric A. Richner, Jr.* (*Dyer, Meek, Ruegsegger & Bullard,* of counsel), for defendant.

Black, J. This is one of the many cases, appealed to this Court as a matter of right under former practice, where controlling issues of fact only have been tried on mutual waiver of a jury; whereupon the losing party has come here with allegation that

the trial judge's findings of fact are contrary to the clear preponderance of the evidence.*

The instant case was tried thoroughly. Both counsel left no fact unturned or unrevealed which bore upon the triable issue. Such issue, reducing it to essence, was whether plaintiff Kevreson's rather manifest negligence, in causing two of the heating boilers in his business building to be connected with a single stack which was too small for the efficient venting of both boilers, was the proximate cause or at least a contributing cause of the explosion or explosions which ensued. Stated in converse, the issue was whether defendant's servicemen were duly warned—as claimed by plaintiff—against turning on the two boilers so that they might operate simultaneously.

That issue was resolved in favor of plaintiffs and against defendant by the trial judge. Equally diligent, the trial judge prepared detailed findings of fact. Such findings are informatively comprehensive. Since they are fairly supported by proof found credible below, we adopt such findings in full and present them here.

"FINDINGS OF FACT

"1. Plaintiff, Milton L. Kevreson, was the owner and operator of the Uptown Radio Company, at 16021–16041 Woodward avenue, in the city of Highland Park, Michigan, in 1960. Before 1959, he occupied only the south portion of the building which was supplied gas from a service off the Woodward main, metered at a location near the southeast corner

---

* Former Court Rule No 64 (1945) provided that "Appellant may assign as error that the judgment is against the preponderance of the evidence." This has been changed to "Appellant may assign as error that the finding on the issue tried without a jury is clearly erroneous." GCR 1963, 810. The change of wording does not affect our status as a reviewing Court. We adhere to what was said on that score in *Schneider* v. *Pomerville*, 348 Mich 49, *Northwest Auto Company* v. *Mulligan Lincoln-Mercury, Inc.*, 348 Mich 279, and *Barnes* v. *Beck*, 348 Mich 286.

of the building, from which point a fuel line ran to a Morheat boiler located at rear or westerly side of the building. In 1959 he purchased the building, including the northerly portion known as 16041 Woodward, and gas was supplied to the northerly portion by a service line from the main at Puritan avenue, which entered the building on the northerly side. The acquired premises, 16041 Woodward avenue, had been heated by a cast iron boiler identified as a Hook boiler located in the lower level or pit of a separate boiler room at the rear of the premises. He purchased a Morheat boiler, boiler no. 3, to be installed in the boiler room of the north building, on the structural steel frame at the upper level. It was contemplated all 3 boilers would be tied into the same heating system.

"2. It was established that the plaintiff, the heating contractor, and the city inspector understood that boiler no. 2 would never be used except as a standby boiler in the event that boilers no. 1 and no. 3 became inoperative, and under no circumstances was boiler no. 2 to be put into operation while boiler no. 3 was operating. Mr. Coleman, the city inspector, and Mr. Simon, the heating engineer and contractor, advised the plaintiff that boilers no. 2 and no. 3 could not be safely operated simultaneously on the existing single stack due to the design of each boiler; boiler no. 2 being low efficiency atmospheric type burner, while boiler no. 3 was a high efficiency power type burner.

"3. Between July and November, 1960, plaintiff's employees intermittently worked on installing the new boiler and tying the 2 heating systems together; a permit from the city of Highland Park to a qualified contractor was required for installation, and while Mr. Simon made application and was given a permit on November 2, 1960, neither he nor his company were qualified to supervise installation, and the permit was properly cancelled. On November 4th a new permit was applied for in the name of Gas Heating Service Company, which is a trade

name for William Richards. Mr. Richards testified that he applied for the permit as an accommodation but had nothing to do with the installation.

"4. Installation of boiler no. 3 was completed by November 4, 1960, except for minor adjustments, which were made on November 7, 1960. On the latter date, boiler no. 3 was turned on, along with boiler no. 1, which had been in operation throughout the period, and from at least November 10, 1960, through the evening of November 11, 1960, boilers no. 1 and no. 3 were in continuous operation.

"5. Earlier on November 8, 1960, Mr. Simon found boiler no. 2 to have a faulty diaphragm on the main gas control valve, which was ruptured and leaking and was by-passing raw unburned gas into the chimney stack.

"6. On November 10, 1960, plaintiff noticed a strong odor of gas in and about the premises and called the Michigan Consolidated Gas Company, defendant herein, which sent several servicemen to make an inspection. A serviceman promptly responding, discovered a substantial leak because of a loose union in the fuel line being installed by plaintiff's employees running to the new Morheat boiler. After this leak was eliminated, the serviceman made a check throughout the entire premises for any possible other leaks and discovered two small leaks, one on one of the meters on the Puritan service and the other in the cock where that service entered the building. Temporary repairs were made and an order was put through to defendant's street department to install and replace the meter, and make permanent repairs to the service cock and outside stopbox. Later that day, a street crew arrived to do the work, but since the address on the instructions was 16021 Woodward, the crew assumed the work was to be done on the Woodward service, proceeded to put in a new box there. Since there was no evidence of a leak at the service cock on that service line the defendant's service department was contacted and the original serviceman returned to the premises

and showed the street crew that it was on the Puritan service that the work was to be done. That street crew dug down to the service, found that the outside stop-box had been completely cemented over, and was about to install a new outside shut-off and stop-box and renew the service by running a 1-1/2 inch copper tubing through the old line, when the question arose as to the adequacy of that size service in light of the additional gas usage by the additional boiler, and the fact that there was already installed two 60-light meters on that line. The work was left unfinished, the excavation barricaded, and it was not until November 20, 1960, that it was decided to install an entirely new 2-inch line, which was done at that time.

"7. On November 11, 1960, two servicemen came to the premises late in the afternoon to change the meters formerly found to be leaking. They found the meter to be changed and measured the gas to the Hook boiler in the pit. These servicemen testified on trial they found this boiler on and shut it off accordingly in order that the meter could be changed, and after changing the meter, they again went to boiler no. 2 to restart it. While doing so, two men were working on the new boiler no. 1,* located above them and it went on with a bang, causing the servicemen some concern. They remonstrated with the workmen for causing a minor explosion above them while they were down in the pit. Plaintiff's witnesses testified that the only persons to work on boiler no. 3 were John Helm, and his assistant, who left the premises at 5 p.m., which is the normal termination of their 8-hour workday. The defendant's employee Mr. Sturgeon, stated that without speaking to the alleged unidentified workmen, he proceeded to the pit, turned boiler no. 2 off, replaced the meter servicing boiler no. 2, returned to the furnace room, and again went into the pit without say-

---

* The judge's reference to boiler no. 1 appears to be either a misprint or minor error. According to the testimony his reference here should have been to boiler no. 3.

ing anything whatsoever to the 2 unidentified men, who were allegedly working on boiler no. 3, and did not advise them what he was going to do with boiler no. 2, making no attempt to ascertain what work the alleged 2 workmen were performing on boiler no. 3 overhead. Mr. Sturgeon further testified that prior to opening the gas valves in boiler no. 2 and igniting the boiler, he stuck his head into the box of boiler no. 2 and observed that the flue was clogged. It was at this point in time, he testified, that the workmen on the upper level did something to boiler no. 3 which caused a bang. It is agreed by all witnesses that the defendant employees, without inquiring as to the cause of the alleged explosion, then proceeded to open the gas valves of no. 2 to ignite the boiler and put it into operation.

"8. There were no further calls by defendant employees after the meter change on Friday, November 11, 1960, the remainder of that week.

"9. When plaintiff opened his store the following Monday, he found an explosion or explosions had occurred during the weekend with extensive damage to all 3 boilers and the surrounding parts of the building and effects. Plaintiff testified that he shut off all 3 boilers, all 3 meters, and called the defendant.

"He also claimed that he notified Mr. Simon immediately, who dropped everything and came to Detroit immediately. However, defendant's witnesses testified that the defendant was not called until 2:55 p.m. and that Simon did not arrive until late Tuesday evening, November 15th, and that it was not until the next day that Messrs. Simon, Richards, Coleman, the Highland Park inspector, the plaintiff, and defendant's investigator were able to discuss thoroughly the possible causes of the explosion, while in the meantime defendant's emergency crew, investigators, and servicemen had made thorough and complete checks throughout the premises, establishing there were no gas leaks existing anywhere in the premises. It was the testimony of Mr. Simon that he made notes during his investiga-

tion, studying the problem throughout the night, and on the following day arrived at the conclusion that the explosion took place in boiler no. 2 because of the existing explosive conditions—the defective diaphragm, the clogged flue, and the fact that both boiler no. 2 and boiler no. 3 were in operation while being vented into the same stack contrary to the safety instructions issued by Mr. Simon and Mr. Coleman.

"10. Plaintiff and plaintiff's representatives testified, and it is found as a fact, that a sign was affixed to the door of boiler no. 2 reading, 'DO NOT TURN ON'; that the boiler was shut off and was not again on until defendant's serviceman turned it on in connection with the meter replacement.

"Defendant witnesses denied knowledge of the sign or any notice that the boiler was not being operated and should not be turned on.

"11. It is found that the defendant serviceman did turn boiler no. 2 on with a weekend explosion ensuing with a consequent control failure in the two Morheat boilers no. 1 and no. 3 causing them also to explode.

"12. The cost of repair of boiler no. 2 was $133-.88, and since the accident plaintiff has been heating his entire store with only that one boiler, during the 3 subsequent heating seasons. Damage to the 2 Morheat boilers was so extensive that the cost of repair would have been as great as the cost of replacement and plaintiff's insurers compromised plaintiff's claim with him for damage to the boilers in the amount of $9,554.60.

"Plaintiff Kevreson claimed loss of $23,592.43 while that of the plaintiff's insurance companies aggregated $13,088.45."

Following the above Judge Bowles recorded his "Conclusions of Law." They follow:

"1. Defendant's employees were negligent in turning on boiler no. 2 while boiler no. 3 was operational since:

"a. to turn on boiler no. 2 while boiler no. 3 was operational was hazardous in that there was insufficient stack size to handle both at the same time;

"b. because there was a clogged flue condition which had been discovered by defendant's employees on November 11th or should have been discovered then; and

"c. because due to a defective diaphragm of boiler no. 2 it was passing raw unburned gas into the chimney stack.

"2. The act of defendant's employee in turning on boiler no. 2 on the evening of November 11, 1960, was negligent because:

"a. a sign on the boiler stating 'DO NOT TURN ON' gave due notice that the boiler could not be turned on safely; and

"b. even assuming that there was no such express notice to defendant's employees, knowledge that the flue was clogged would constitute sufficient warning of a hazardous condition as to require inquiry and verification.

"3. The acts of negligence of defendant's employee or employees were a proximate cause of the explosion, the first explosion taking place in boiler no. 2 because of the conditions hereinbefore set forth, and explosions thereafter resulting in boilers no. 1 and no. 3 with the consequent damages.

"4. The damages suffered by the plaintiffs, generally stated, were caused proximately by the acts of negligence of defendant's employees and plaintiffs may recover against defendant."

Some comment is in order. The decisive conclusion of the fact-finding judge was that defendant's serviceman received timely warning against turning on boiler no. 2; in other words that his act of turning on boiler no. 2 contrary to warning constituted an intervening cause which insulated plaintiff Kevreson from guilt of negligent responsibility—in whole or in part—for the ultimate harm. The judge's factual conclusion in such regard is sharply dis-

puted by what seems to be persuasive testimony, enough to impel observation that plaintiffs' proof appears—in print—as being weaker than that which defendant adduced *contra*. In short, had the responsibility for original determination of such factual issue been cast upon this Court rather than upon the trial judge, it is not unlikely that we might have agreed with defendant-appellant that plaintiffs did not sustain their affirmative burden.

All this, however, departs from the appellate function. The trial judge, supported legally by testimony he had personally heard and seen delivered, concluded as above. We in turn have read only a sterile transcript of the pro and con testimony. In consequence the judge's conclusion, reached upon pivotal testimony believed by him, forecloses further appellate inquiry. There is no ground, withal, upon which we may say that the judge's findings and therefore his judgment are contrary to the clear preponderance of the evidence.

Corollary to its attack upon the findings, appellant alleges an abuse of discretion on the part of Judge Bowles, saying that the judge should have granted its motion for leave to plead contributory negligence as an affirmative defense. The motion was made after entry of judgment. We agree that defendant was entitled to such an amendment, GCR 1963, 118.3 being operative in our view. ·As appellant's counsel argue later in their brief, the issue of plaintiff Kevreson's contributory negligence was "impliedly tried," thus bringing the cited rule into play.

When defendant moved for a new trial and specifically introduced the issue of contributory negligence, Judge Bowles proceeded to decide that issue upon the proofs as taken. Of importance is the fact that defendant did not at any time move to reopen the proofs to sustain further its burden of

proving contributory negligence. Its position is that, the issue having actually been tried within GCR 1963, 118.3, this Court should—on the record as it is—hold plaintiff Kevreson guilty of contributory negligence as a matter of law. That we cannot do: The issue was one of fact. The trial judge disposed of it, well within his authority as fact trier, as follows:

"Further, assuming that contributory negligence is in the case by way of claim, it is not any negligence of the plaintiff, which is contributory negligence, since contributory negligence implies negligence contributing necessarily to the cause of the accident. The so-called contributory negligence claimed by defendant is antecedent to the negligence claimed by plaintiff, that is, even assuming for the sake of argument that plaintiff's agents were negligent as claimed by defendant, defendant's negligence was subsequent thereto and the two did not concur or contribute together toward the accident."

Whether proven negligence of a plaintiff is contributory usually becomes a question for the trier or triers of fact. Considering the apparently unending difficulty courts are experiencing with problems of causation (see Prosser's "Palsgraf Revisited," 52 Mich L Rev 1; Green, "The Causal Relation Issue in Negligence Law," 60 Mich L Rev 543), it is appropriate to repeat recent admonitions leading toward fuller employment of the fact-finding process. In "Palsgraf Revisited" (p 32) Prosser says that "Palsgraf may well serve as an example and a warning to appellate courts to proceed with caution where facts vary so greatly and to avoid arbitrary rules which purport to be of universal application."*

---

* Prosser's footnote quotes approvingly from *Jackson* v. *B. Lowenstein & Bros.,* 175 Tenn 535, 538 (136 SW2d 495):

"[The *Palsgraf Case (Palsgraf* v. *Long Island R. Co.,* 248 NY 339

No error has been made to appear. Judgment affirmed. Costs to plaintiffs.

KAVANAGH, C. J., and DETHMERS, SOURIS, SMITH, O'HARA, and ADAMS, JJ., concurred.

KELLY, J., did not sit.

---

[162 NE 99, 59 ALR 1253])], by virtue of the sharp difference of opinion of the judges, should be a warning to appellate courts not lightly to assume the primary duty of determining liability or non-liability, in actions of tort, but to leave that duty where the Constitution has placed it, with the jury, as triers of facts, and if they act capriciously and arbitrarily to supervise their action."