Zahra, J.
 

 This lawsuit arises from the April 17, 1991, explosion and fire that resulted in the death of Juanita Buechl. The explosion occurred when a spark from a light bulb ignited propane gas that accumulated in the deceased’s garage after her husband, Joseph Buechl, inadvertently opened the valve on a gas line in the garage. The gas line had not been in use for some time and was not capped to prevent the releasing of gas by the activation of the line valve. Plaintiff brought suit against Fuelgas Company (hereinafter defendant), a division of Emro Propane Company and the supplier of the propane gas and the installer of the main gas supply system, and Richard Dahn, doing business as Prescott Heating and Cooling, the installer of the garage gas line. Defendant appeals as of right from a June 6, 1997, final judgment. We reverse and find that defendant is entitled to judgment as a matter of law.
 

 
 *706
 
 I. FACTS
 

 In 1974, Mr. and Mrs. Buechl decided to take steps to effectuate a permanent move to their Ogemaw County summer cottage. In order to convert the cottage to a full time residence, a gas system had to be installed. The Buechls hired defendant to install a 500-gallon bulk tank to supply propane gas to their home. This gas supply system featured two regulators in the line that fed the gas to the home: one high pressure regulator at the tank; and a second stage, low-pressure regulator installed just outside the house. The gas delivery system that defendant installed outside the home belonged to defendant and the interior lines and appliances that used the gas belonged to the Buechls. Defendant delivered gas to the Buechls three or four times a year. Defendant serviced, maintained, and periodically inspected its equipment.
 
 [1]
 

 Defendant offered a service to its customers called a “GAS Check.” “GAS” stands for “Gas Appliance System.” This service consisted of a complete inspection of the system, including interior lines and appliances, for leaks and proper installation and operation. The Buechls never purchased the “GAS Check” or any other maintenance or repair services from defendant.
 

 In approximately 1985, the Buechls hired Richard Dahn to install a gas stove in their garage.
 
 [2]
 
 During the installation Dahn turned off the gas service, tapped defendant’s gas line between the two regulators and installed a new line that ran underground to
 
 *707
 
 the exterior wall of the garage. The additional line rose out of the ground near the west wall of the garage, where another second stage low pressure regulator was installed just before the gas line entered the garage. The additional line had a manual shut-off valve inside the garage. The Buechls never informed defendant that they modified the gas line or that they installed a stove in the garage. There is no dispute that the original gas delivery system was properly installed by defendant and that Dahn properly installed the additional line that ran into the garage.
 

 The garage stove was never operable because of missing parts. Approximately one year before the accident, Mr. Buechl disconnected the stove and gave it away. He never informed defendant or Dahn that he removed the stove. Mr. Buechl did not cap the line in order to avoid inadvertent activation of the line.
 
 [3]
 

 Before the accident, Mr. Buechl had stopped driving because of poor eyesight. However, on the day of the accident, Mr. Buechl drove his car out of the garage so he could remove his lawnmower. When Mr. Buechl returned the car to its previous position, the car struck the valve, causing gas to leak into the garage. The explosion was ignited by a spark from a light bulb that activated while Mrs. Buechl was in the garage. Mrs. Buechl was badly burned and later died from her injuries.
 

 Plaintiff, the Buechls’ daughter and personal representative of Mrs. Buechl’s estate, filed suit against defendant and Dahn. Both defendants promptly filed a third-party complaint against Mr. Buechl. Defendant
 
 *708
 
 filed several motions for partial summary disposition. One such motion relating to the question of duty is pertinent to this appeal. Specifically, defendant argued it had no duty to inspect the gas lines inside the Buechls’ home, as alleged in plaintiff’s complaint.
 
 [4]
 
 The trial court granted defendant’s motion, finding as a matter of law that defendant was not under any duty to conduct a periodic gas check of the gas system and appliances within the Buechls’ home. Nonetheless, the trial court allowed the case to proceed to trial to allow plaintiff the opportunity to establish that defendant engaged in some other conduct that gave rise to a duty on defendant’s part to inspect the gas system and appliances within the Buechls’ home.
 
 [5]
 

 
 *709
 
 The case proceeded to trial, and at the close of proofs, defendant brought a motion for a directed verdict. Defendant argued that the proofs failed to establish that defendant had a duty to inspect the Buechls’ gas system and appliances within the home. The trial court denied the motion.
 

 The jury found that Fuelgas and Dahn were negligent and that each of them was a proximate cause of the damages claimed by plaintiff. The jury apportioned negligence equally at fifty percent each. The jury also found Mr. Buechl to be negligent. The jury found Mr. Buechl ninety percent at fault with respect to Fuelgas, and eighty-seven percent at fault with respect to Richard Dahn. The plaintiff was awarded “$0.—1.00 One dollar” each for medical expenses and Mrs. Buechl’s conscious pain and suffering. The jury awarded “$0.00” to the decedent’s next of kin for loss of society and companionship.
 

 Plaintiff filed a motion for judgment notwithstanding the verdict (jnov) or a new trial with respect to the issue of damages, and defendant filed a motion for JNOV or a new trial with respect to the issue of liability. After numerous hearings, the court took all posttrial motions under advisement. On March 27, 1996, more than two years after the verdict was rendered, the trial court granted jnov to plaintiff for medical expenses in the amount of $146,214.17 and granted a new trial with respect to noneconomic damages. Defendant’s posttrial motions with respect
 
 *710
 
 to liability were denied. A judgment consistent with this ruling was entered June 12, 1996.
 

 On November 25, 1996, the new trial with respect to noneconomic damages commenced. Just before the start of the second trial, plaintiff moved to dismiss Dahn from the lawsuit. The motion was granted over defendant’s objection. The second jury returned a verdict in the amount of $200,000 for noneconomic damages. Defendant appeals as of right from the resulting final judgment entered on June 6, 1997.
 
 [6]
 

 H. ANALYSIS
 

 Defendant argues that the trial court erred in denying its motion for summary disposition.6
 
 [7]
 
 More specifically, defendant argues that the trial court erred in finding that there was a question of fact whether defendant had a duty to inspect portions of the gas delivery system belonging to the Buechls. We agree. We review a trial court’s decision to grant or deny a motion for summary disposition de novo.
 
 MacDonald v PKT, Inc,
 
 233 Mich App 395, 398; 593 NW2d 176 (1999).
 

 In order to establish a prima facie case of negligence, plaintiff must present evidence to establish (1) the existence of a legal duty by defendant toward plaintiff, (2) the breach of such duty, (3) the proximate causal relation between the breach of such duty
 
 *711
 
 and an injury to plaintiff, and (4) that plaintiff suffered damages.
 
 Lorencz v Ford Motor Co,
 
 439 Mich 370, 375; 483 NW2d 844 (1992). The threshold question, whether a duty exists, is a question of law solely for the court to decide.
 
 Murdock v Higgins,
 
 454 Mich 46, 53; 559 NW2d 639 (1997). In determining whether to impose a duty, this Court evaluates factors such as the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented.
 
 Id.
 

 In this case, plaintiff would have this Court impose a duty on defendant to inspect and maintain not only the external delivery system owned by defendant, but also the internal lines and appliances owned by the Buechls. Such a duty is inconsistent with existing Michigan law.
 

 In
 
 Fleegar v Consumers Power Co,
 
 262 Mich 537, 544-545; 247 NW 741 (1933),
 
 [8]
 
 the Supreme Court stated the general duty that applies to suppliers of gas:
 

 When gas is measured and delivered to a customer, he ordinarily may use it for such purposes as he sees fit. The piping and conduits which he uses belong to him and are ordinarily under his control, and it is his duty to keep them in repair. Ordinarily, a gas company which does not install pipes in the customers’ building has no control over them and is not responsible for their condition, maintenance, or defective installation, nor for injuries caused by gas escaping from a leak therein, of which it has no knowledge.
 

 
 *712
 
 Cases since
 
 Fleegar
 
 have held gas suppliers liable for defective conditions inside a user’s premises only where the gas supplier was negligent in repairing or modifying the system within the premises of the end user. For example, in
 
 Gadde
 
 v
 
 Michigan Consolidated Gas Co,
 
 377 Mich 117, 126; 139 NW2d 722 (1966), the Supreme Court found that a gas supplier could be liable for a gas explosion originating in a gas stove where the gas supplier’s employee worked on the stove just before the explosion. The Court found that the supplier’s employee may have been negligent “either in causing a leak or in failing to discover a leak which a trained serviceman should have discovered while working on the stove.”
 
 Id.
 
 Similarly, in
 
 Kevreson v Michigan Consolidated Gas Co,
 
 374 Mich 465; 132 NW2d 622 (1965), a gas supplier was found liable for injuries that resulted where its employees agreed to effectuate repairs of a gas leak on the plaintiff’s premises and, in the course of effectuating the repairs, the employees negligently operated two boilers simultaneously through a single exhaust stack that lacked the capacity to vent both boilers. See also
 
 Young v Lee,
 
 310 Mich 42; 16 NW2d 659 (1944) (finding gas supplier negligent for failing to install a vent while connecting gas supply to a hot water heater in the plaintiff’s home).
 

 In each of the cases cited, the gas supplier agreed to enter the plaintiff’s premises and perform services within the gas supplier’s professed area of expertise. In each instance the gas supplier was negligent in performing the function it agreed to perform. Michigan courts have imposed a similar duty on the suppliers of electricity. Electricity suppliers have a duty to inspect and maintain the wires leading to a building,
 
 *713
 
 but no duty has been imposed on suppliers of electricity to inspect the wiring inside the building to determine whether the wiring was properly installed. See
 
 Groncki v Detroit Edison Co,
 
 453 Mich 644; 557 NW2d 289 (1996);
 
 Schultz v Consumers Power Co,
 
 443 Mich 445; 506 NW2d 175 (1993).
 

 Michigan courts have traditionally imposed on the suppliers of dangerous commodities a high standard of care in supplying those commodities—a standard commensurate with the danger of the product. However, no Michigan court has imposed on such a supplier a duty to unilaterally inspect lines, conduits, and appliances over which it has no control. In fact, such a duty would be virtually impossible to satisfy. Suppliers of gas and electricity not only would be required to provide service safely to the doorsteps of their customers, but also would be required to enter the homes and businesses of thousands of end users and inspect the lines and conduits through which the service is supplied and each appliance that utilizes the service. Even if such an inspection could be undertaken, any change in appliances could trigger a new obligation to inspect.
 

 The duty imposed on the supplier of a dangerous commodity to inspect interior lines, conduits, and appliances on the premises of an end user should be limited to those situations where the supplier has expressly agreed to enter the user’s premises for the purpose of making an inspection, modification, or repair. This limitation on the duty imposed on the suppliers of dangerous commodities does not in any way create an unreasonable risk of harm to the end user. While commodities like gas and electricity are dangerous, the dangers associated with these com
 
 *714
 
 modities are well known to the average consumer. Children are taught at an early age not to put their finger in a light socket or to touch a downed electrical wire. Persons of average intelligence know not to light a match and to ventilate and evacuate an area when an odor of gas exists. It is common knowledge that failure to take precautions when dealing with dangerous commodities, like gas and electricity, can result in fatal consequences. Cognizant of these risks, the reasonable person should seek expert assistance when dealing with dangerous commodities on the person’s premises.
 

 Therefore, in accordance with the reasoning in
 
 Fleegar
 
 and its progeny, we hold that the supplier of a dangerous commodity has a duty to ensure that its product is delivered safely to the exterior of the premises of the end user but, in the absence of an agreement to do otherwise, that duty does not extend to the inspection of the interior lines, conduits, and appliances over which the supplier has no control.
 

 In the present case, it is undisputed that the gas delivery system owned and maintained by defendant functioned appropriately and did not malfunction or in any way contribute to or cause the tragic explosion giving rise to this suit. Similarly, there exists no evidence that defendant agreed to inspect, maintain, or repair any of the Buechls’ appliances or internal gas lines. The evidence established that defendant offered to the Buechls for a fee a gas inspection service that would have led to discovery of the uncapped gas line in the garage. However, the Buechls made an economic decision not to have this service performed by defendant or to hire someone else to inspect their gas lines and appliances. Accordingly, we find that
 
 *715
 
 defendant had no duty to inspect the interior lines and appliances that belonged to the Buechls.
 

 Plaintiff argues that a duty was estabUshed when defendant’s manager admitted that if an employee discovered an unsafe condition or if a customer told an employee about an unsafe condition, defendant would have been obUgated to in some way address this risk of harm. Because gas is a dangerous commodity, we agree that if defendant had actual knowledge of the uncapped gas line, it would have been under a duty to either cap the Une or warn the Buechls of the risks associated with leaving the line uncapped. However, there was no evidence that defendant’s employees had been informed that an unsafe condition existed. Even if we assume that defendant’s employees became aware that a third party modified defendant’s gas Une to provide a source of gas in the garage, such knowledge does not equate to knowledge of an unsafe condition. It is undisputed that Dahn properly modified the gas line. It was not the addition of a gas line into the Buechls’ garage that constituted the dangerous condition that caused this accident. Rather, the dangerous condition was created by the failure to cap the gas line after the gas stove was removed. The evidence presented at trial estabUshed that Mr. Buechl removed the stove and failed to cap the unused gas line. The evidence also estabUshed that defendant was never informed by the Buechls or anyone else that there was an uncapped gas line in the Buechls’ garage. Defendant was not under a duty to correct or warn about dangers of which it had no knowledge.
 

 Finally, plaintiff argues that defendant had a duty to inspect and replace its regulators on the gas dehv
 
 *716
 
 ery system, which defendant owned and maintained, and if defendant had followed the recommendation of the regulator manufacturer and replaced the regulators after fifteen years, defendant would have discovered the dangerous condition. This argument must also fail. Defendant’s legal duty was not, as plaintiff claims, to replace its regulators every fifteen years, but rather to provide the Buechls’ home with propane gas in a reasonably safe manner. The undisputed facts establish that defendant satisfied this duty. The equipment owned and maintained by defendant functioned properly. Further, defendant’s equipment had nothing to do with the cause of this accident.
 
 [9]
 

 in. CONCLUSION
 

 Accordingly, we find that the trial court erred in denying defendant’s motion for summary disposition. The judgments entered on June 12, 1996, and June 6, 1997, are vacated, and the case is remanded for entry of an order granting summary disposition for defendant. Defendant’s remaining issues on appeal are rendered moot by this opinion.
 

 
 *717
 
 Vacated and remanded for entiy of an order consistent with this opinion. We do not retain jurisdiction.
 

 Markman, P.J., did not participate.
 

 [1]
 

 In 1988 and 1990, defendant repaired minor leaks in the gas tank.
 

 [2]
 

 The Buechls also hired Dahn to service their furnace or other appliances whenever they needed maintenance or repair.
 

 [3]
 

 Capping a line is the installation of a screw-on cap that cannot be removed without a tool.
 

 [4]
 

 Plaintiff’s complaint alleged, in pertinent part,
 

 [t]hat a “gas check” is an obligation by propane distributors to inspect all gas lines, valves, couplings, joints on other accessories, to discover and remedy any unreasonable risk of injury and to cap any lines no longer in use or to shut off the gas to the system if a dangerous condition exists.
 

 Plaintiff further alleged that defendant was negligent because, among other things, defendant did not perform a gas check when it knew or should have known that the original gas delivery system it installed had been modified.
 

 [5]
 

 The scope of the cause of action that was submitted to the jury is unclear. On the first day of the first trial, plaintiff’s counsel asked the court to clarify its ruling regarding its finding that defendant had no duty to conduct a gas check. Plaintiff’s counsel argued, in relevant part:
 

 [S]o, I may be mistaken, but I don’t believe that the Court went as far as to say that the idea of them—that there is no duty to inspect the system. And I think that even the case that we cited to Your Honor that was attached to our brief indicates that they may see something that triggers a check.
 

 The trial court eventually ruled:
 

 I am prepared to rule. As to the duty to offer—or excuse me—to do a gas check, as that term of art refers to a program of inspection of the system, there is no legal duty.
 

 
 *709
 
 If there is testimony at the time that I hear it [sic] regarding other information that might have suggested to the defendants that they needed to take a certain course of action. That is another issue and we will rule on it at that time.
 

 [6]
 

 The June 6, 1997, final judgment reflected the noneconomic damages awarded by the second jury and the liability found by the first jury, including the finding that Mr. Buechl was ninety percent at fault for the damages assessed against defendant.
 

 [7]
 

 Defendant raises other issues on appeal relative to the propriety of setting aside the original verdict and the trial court’s failure to consider the collateral source payments of Mrs. Buechl’s medical bills. These issues are rendered moot by our decision in this case.
 

 [8]
 

 The
 
 Fleegar
 
 decision addressed many issues. One aspect of
 
 Fleegar,
 
 relating to whether the testimony of an employee of the opposing party was binding on the party calling the employee as a witness is no longer valid law in Michigan. See
 
 Gadde v Michigan Consolidated, Gas Co,
 
 377 Mich 117, 123, n 1; 139 NW2d 622 (1966). However, the aspect of
 
 Fleegar
 
 relied on by this Court in this case remains the law of Michigan.
 

 [9]
 

 Even if we were to assume, as plaintiff argues, that defendant had a duty to replace the regulators every fifteen years and consequently to inspect all interior gas lines and appliances, defendant would not have discovered the uncapped gas line in the garage. The original gas line was installed by defendant some time in 1974. Thus, the regulators should have been changed, according to plaintiff, in 1989. However, Mr. Buechl testified that the stove was not removed until one year before the explosion, or sometime in 1990. Thus, if defendant had done as plaintiff argues it should have, defendant would have discovered a properly connected, albeit nonfunctioning, stove in the Buechls’ garage. Had defendant found a nonfunctioning stove in the Buechls’ garage, defendant’s obligation, if any, would have been to close the gas line valve leading to the stove. Defendant would not have been under a duty, nor would defendant have had authority, to remove the stove and cap the line.