*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DMYTRO MAKSYMENKO,

        Plaintiff-Appellant,

and

DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

        Intervening Plaintiff,

v

CONSUMERS ENERGY COMPANY,

        Defendant-Appellee.

UNPUBLISHED
April 27, 2026
9:52 AM

No. 372819
Oakland Circuit Court
LC No. 2023-198923-NO

Before: RIORDAN, P.J., and O'BRIEN and YOUNG, JJ.

PER CURIAM.

Plaintiff appeals as of right from the stipulated order dismissing the claim of intervening plaintiff, the Department of Health and Human Services ("DHHS"), to challenge an order granting summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact) in favor of defendant, Consumers Energy Company ("Consumers Energy" or "the company"). We reverse.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This matter stems from a gas explosion and fire at a house in Commerce Township, Michigan ("the property"). Plaintiff lived at the house at the time of the explosion with his mother, Lyudmyla Krykun, who owned the property. The house had two pipelines: (1) an underground natural-gas pipeline running upstream from a gas main across the street and connecting to the inlet of the meter attached to the front of the house (hereinafter, "the gas line"; also referred to as "the upstream line" or "the service line"); and (2) a fuel line running downstream from the outlet of the meter exposed along the exterior of the house and underneath the deck, and connecting to the south furnace closet inside of the house (hereinafter, "the fuel line" or "the downstream line"). At the

-1-

time of the explosion, Krykun was out of town. Before the explosion, plaintiff was inside the house and his friend, Oleksandr Filippov, was on the porch. After the explosion, the Commerce Township Fire Department and Oakland County Sheriff's Office arrived to contain the fire, locate the victims, and investigate the scene. It is undisputed that plaintiff sustained severe injuries.

Six butane tanks were recovered from the property, three of which were empty. Plaintiff stated he never used any of the butane tanks. Marijuana plants and other processing equipment were found on the property. Less than two weeks later, there was a joint site investigation at the property. Consumers Energy performed a pressure test on the gas line and found no leaks. Investigators from Farm Bureau Insurance Company, the homeowner's insurer, performed a flow test on the fuel line using nitrogen and found three leaks (however, one of the leaks was "very small"). A lab inspection of the fuel line occurred later. Plaintiff stated he did not smell anything before the explosion or feel any "strange symptoms." Krykun did not smell any gas before she went out of town. Before the explosion, Filippov did not smell anything "out of the ordinary[.]"

About one month before the explosion, Consumers Energy replaced the gas line at the property in an effort to replace "vintage" lines. A crew spent one day replacing the old copper gas line to one made of plastic. The gas main was made of steel. The company owned the gas line and the meter attached to the house, but Krykun owned the fuel line as the homeowner at the time. The crew located the "T attachment" of the gas main, or the connection point. William Neill began digging near the gas main, and the crew used an excavator to dig "the remainder." One of the workers and crew leader, Alexander Hitt, "remove[d] the riser from the meter," or the copper line, to ensure the gas to the house was "shut." A welder "retired" the copper gas line and a new connection point was welded on to the gas main.

To install the new line, the crew "missiled the road" to access underneath the road up to the property line. A missile is "a pneumatic tool that you attach an air line to," which "uses air pressure to bore itself through the ground[.]" Several crew members used hand shovels to dig a hole extending about 4 to 5 feet away from the meter on the house "to expose the service line." A "rat tail," also known as a trencher, was a machine used to cut "through the dirt" to create a trench. The rat tail was used to connect the hole near the house to the hole at the end of the road. The crew installed the new plastic pipe in the trench. The new plastic pipe was first connected to the gas main. The service line was connected to the meter using a riser. Hitt went to the gas main, where he "attach[ed] the gas service" and tested the air. After the new plastic gas line was connected to the gas main, either Hitt or Ian Chilcote performed an air pressure test on the gas line, beginning with the new connection on the gas main to ensure there were "no leaks." The gas line was air tested from the new connection "up to the house," which included "an air test in the lock wing that's at the riser." After air testing, the gas main was tapped and gas was introduced "into the new service." After verifying someone was inside the house, a shadow test was performed at the property, which involved "introduc[ing] gas into the household" through the meter. The shadow test indicated there were no gas leaks inside the house. There was also a "soap test" performed to check for leaks on the "external portion" of the service line and at the meter. After testing, the trench and holes were backfilled. After the gas was turned on, a worker entered the house to relight the gas appliances.

The record included the opinions from three individuals regarding potential causes of the explosion. Elizabeth C. Buc, Ph.D., P.E., IAAI-CFI, from the Fire and Materials Research

Laboratory, LLC, was a materials engineer and fire investigator. Buc processed the fire scene during the joint investigation, and tested the butane tanks and the fuel line. Buc considered two potential causes for the gas explosion: (1) natural gas and (2) butane. Buc opined the explosion was caused by butane gas and the leaks in the fuel line were caused by the "explosion and post-explosion activities[.]" Peter Wood, a licensed heating contractor, builder, and master plumber, visited the property after the explosion on one occasion. Wood opined the work performed by Consumers Energy in replacing the copper service line "disturbed the downstream piping system after the meter," and "more likely than not . . . could have caused a gas leak that created the explosion." Wood believed the explosion was caused by natural gas. He stated Consumers Energy was responsible for ensuring the upstream and downstream lines do not leak and are "properly installed and pressure tested[.]" Wood stated the torque from the "heavy equipment" also "disturbed the piping on the home side." Robert Miller, an explosion and fire investigator, was also at the site inspection. Miller disagreed that butane was "the probable cause" and, instead, did not rule out natural gas as a cause because there were leaks in the fuel line and "natural gas [was] definitely going to the house." He stated there was a 3-foot-long section of "piping" of the fuel line in the furnace room that "could not be tested" because it was "too damaged." Miller stated there was a "higher probability" natural gas caused the explosion.

Plaintiff filed a complaint, which included a claim of negligence against Consumers Energy. The DHHS moved to intervene to enforce its subrogation right as the state agency responsible for administering Medicaid. Consumers Energy responded and the trial court allowed the DHHS to intervene. The DHHS filed its complaint, asserting its right to recover for payments made for plaintiff's medical care through Medicaid.

Consumers Energy moved to exclude the testimony of Wood, contending he was unqualified to provide an expert opinion regarding how any alleged force caused by Consumers Energy affected the downstream pipes and his opinions were impermissibly made on the basis of unsupported facts. Plaintiff opposed the motion, asserting Wood had over five decades of experience as a heating contractor, builder, and master plumber. The company moved for summary disposition under MCR 2.116(C)(10) seeking to dismiss all claims against it. Consumers Energy argued plaintiff did not establish the company owed him a duty and, even if there was a duty, there was no breach of that duty and plaintiff cannot establish causation. Specifically, Consumers Energy asserted it did not have a duty to inspect the fuel line because it was owned by Krykun, and there was no agreement for the company to inspect or make repairs to this portion of the pipes. Plaintiff opposed the motion, contending the company had a duty to inspect the fuel line for leaks that it reasonably could have created when it replaced the upstream line and performed tests. Consumers Energy filed a reply brief.

The trial court held a hearing and granted the motion for summary disposition. The trial court explained:

> [T]he [c]ourt respectfully rejects that last contention because it is the antithesis of [p]laintiff's own theory that the jostling or the vibrating or the of the pipes earlier at that moment caused the leaking. So . . . but for that last proffer by [Consumers Energy], after having considered all the arguments and the applicable law, the [c]ourt does adopt [Consumers Energy's] reasons and respectfully grant [sic] the motion for summary disposition.

-3-

Some would say that it's prudent for the [c]ourt to opine, nevertheless, or adjudicate . . . well, it could only be opine in dicta, your expert other motion, the [c]ourt is of the judicial opinion to not speak to it because it would be dicta. I've granted your [motion for summary disposition]. So, anyways, that's the ruling of the [c]ourt.

The trial court entered an order granting Consumers Energy's motion for summary disposition. The trial court entered a stipulated order dismissing the DHHS's claim, which was a final order. Plaintiff appealed from that order.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

This Court "review[s] de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "A de-novo review means [this Court] review[s] the legal issue independently, without deference to the lower court." *Bowman v Walker*, 340 Mich App 420, 425; 986 NW2d 419 (2022) (quotation marks and citation omitted). Consumers Energy moved for summary disposition under MCR 2.116(C)(10), and the trial court granted the motion under this subrule having considered evidence outside of the pleadings. A motion for summary disposition under MCR 2.116(C)(10) "tests the *factual sufficiency* of a claim." *El-Khalil*, 504 Mich at 160.

> When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ. [*Id.* (quotation marks and citations omitted).]

Specifically,

> the moving party has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence. The burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists. Where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists. If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted. [*Quinto v Cross & Peters Co*, 451 Mich 358, 362-363; 547 NW2d 314 (1996) (citations omitted.]

"The reviewing court should evaluate a motion for summary disposition under MCR 2.116(C)(10) by considering the substantively admissible evidence actually proffered in opposition to the motion." *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999). "[P]arties opposing a motion for summary disposition must present more than conjecture and speculation to meet their burden of providing evidentiary proof establishing a genuine issue of material fact[.]" *Karbel v*

-4-

*Comerica Bank*, 247 Mich App 90, 97; 635 NW2d 69 (2001) (quotation marks and citation omitted). "If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, whether summary disposition is proper is a question of law for the Court." *Miller Estate v Angels' Place, Inc*, 334 Mich App 325, 330; 964 NW2d 839 (2020). "Whether a defendant owes a plaintiff a duty of care is a question of law," and this Court "review[s] de novo the determination whether a duty exists." *Hill v Sears, Roebuck and Co*, 492 Mich 651, 659; 822 NW2d 190 (2012). "Statutory interpretation is a question of law, which this Court also reviews de novo." *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 493; 791 NW2d 853 (2010).

## B. MOTION FOR SUMMARY DISPOSITION

Plaintiff contends the trial court erred in granting summary disposition in favor of Consumers Energy when there are questions of fact regarding its negligence claim. Because the company owed plaintiff a duty to inspect the fuel line when it replaced the service line, and there are genuine issues of material fact whether this duty was breached, whether the company created leaks in the fuel line which caused a natural-gas explosion, and whether that caused plaintiff's injuries, we agree.

Plaintiff asserted a claim of ordinary negligence against Consumers Energy for its conduct while replacing a service line about one month before the explosion occurred. "All negligence actions . . . require a plaintiff to prove four essential elements: duty, breach, causation, and harm." [*Kandil-Elsayed v F & E Oil, Inc*, 512 Mich 95, 110; 1 NW3d 44 (2023) (quotation marks and citations omitted).] Neither party disputes that plaintiff sustained severe injuries from the house explosion. Harm is established as a matter of law. We find there are questions of fact as to the remaining elements of negligence.

## 1. DUTY

"The common law imposes a general duty to exercise ordinary and reasonable care and caution, i.e., the care and caution an ordinarily careful and prudent person would use under the circumstances." *Marion by Next Friend Marion v Grand Trunk Western R Co*, 341 Mich App 65, 85; 989 NW2d 273 (2022). "Similarly stated, the common law imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to unreasonably endanger the person or property of others." *Id*. (quotation marks and citations omitted). "[A]n actor who undertakes, gratuitously or for consideration, to render services to another . . . may in certain circumstances be liable to foreseeable third persons for negligence." *Smith v Allendale Mut Ins Co*, 410 Mich 685, 715; 303 NW2d 702 (1981) (quotation marks and citation omitted). However:

> When gas is measured and delivered to a customer, he ordinarily may use it for such purposes as he sees fit. The piping and conduits which he uses belong to him and are ordinarily under his control and it is his duty to keep them in repair. Ordinarily a gas company which does not install pipes in the customers' building has no control over them and is not responsible for their condition, maintenance, or defective installation, nor for injuries caused by gas escaping from a leak therein, of which it has not knowledge. [*Fleegar v Consumers' Power Co*, 262 Mich 537, 544-545; 247 NW 741 (1933).]

A gas supplier may be held "liable for defective conditions inside a user's premises only where the gas supplier was negligent in repairing or modifying the system within the premises of the end user." *Girvan v Fuelgas Co*, 238 Mich App 703, 712; 607 NW2d 116 (1999). "However, no Michigan court has imposed on such a supplier a duty to unilaterally inspect lines, conduits, and appliances over which it has no control." *Id*. at 713.

Slightly over one month before the explosion, Consumers Energy replaced the gas line from copper to plastic to modernize its infrastructure. The company owned the gas line, but the fuel line was owned by Krykun, the homeowner at the time of the explosion.

The crew used various equipment to dig up the gas main and retire the service from the old gas line. To install the new plastic gas line from the gas main to the house, the crew used a missile, a type of pneumatic tool, to access underneath the road up until about the property line. Meanwhile, workers used hand shovels to dig a hole by the meter attached to the house "to expose the service line." The hole extended about 4 to 5 feet from the house. Then, a rat tail machine was utilized to create a trench, about 24 inches deep, from the hole near the meter to the hole at the end of the road. The crew installed the new plastic pipe in the trench and connected it to the gas main. The service line was connected to the meter using a riser. To summarize, the gas supplier did not modify the system within the premises of the end user but instead modified the system from a point outside the user's property. However, plaintiffs allege that the boring process "impacted the natural gas lines on plaintiff's property." Plaintiffs go on to allege that the boring process was "recklessly performed." At least one expert, as discussed below, alleges this installation fell below a standard of care, resulting in the harmful effects on the portion of the pipe within plaintiff's home and control. That same expert further alleges the errors in installation by Consumers were discoverable through better testing.

The record supports that Consumers did some follow-up testing that gave no indication of a leak. A crew member performed an air pressure test on the new plastic gas line, beginning with the new connection on the gas main to ensure "the weld [was] safe," and there were "no leaks." The entire plastic gas line was air tested from the new connection "all the way up to the house," which included "an air test in the lock wing that's at the riser." After air testing, the gas main was tapped, and gas was introduced "into the new service." Next, a shadow test was performed at the property, which involved "introduc[ing] gas into the household" through the meter to check for potential gas leaks inside the house. During the shadow test, two dials on the meter are monitored "for five minutes to make sure there's no movement." A "soap" test was performed to check for leaks on the "external portion" of the service line "up to and including . . . the [gas] main." The soap test included the meter itself, "[e]very joint" of the gas service line, and the regulator." After the gas was turned on, a worker entered the house to relight the gas appliances. But statute requires that Consumers test for pressure and there is a question of fact as to whether the tests employed adequately did that so as to "not to unreasonably endanger the person or property of others." See *Marion by Next Friend Marion*, 341 Mich App at 85 (quotation marks and citations omitted).

There is a question of fact whether the company used adequate care while replacing the service line and testing the service line and fuel line.

## 2. BREACH

"[W]hether the defendant owes an actionable legal duty to the plaintiff is one of law which the court decides. And, in contrast, the question of breach—whether defendants' conduct in the particular case is below the general standard of care—is a question of fact for the jury." *Kandil-Elsayed*, 512 Mich at 112 (quotation marks and citations omitted). "Where the evidence presented to a court concerning duty generates a question of fact, that question can be submitted to the jury for resolution." *Id*. at 112 n 2.

> While the court decides questions of duty, general standard of care and proximate cause, the jury decides whether there is cause in fact and the specific standard of care: whether defendants' conduct in the particular case is below the general standard of care, including unless the court is of the opinion that all reasonable persons would agree or there is an overriding legislatively or judicially declared public policy whether in the particular case the risk of harm created by the defendants' conduct is or is not reasonable. [*Moning v Alfono*, 400 Mich 425, 438; 254 NW2d 759 (1977) (footnote omitted).]

Regarding breach, plaintiff has established there is a question of material fact as to whether Consumers Energy's conduct fell below the standard of care. The record established there is a question of fact regarding a specific standard of care. Wood stated Consumers Energy was responsible for ensuring the upstream and downstream lines do not leak and are "properly installed and pressure tested," as well as making sure appliances are properly lit, for the "[s]afety of a home owner." He stated this was required under Chapter 24, Section G2417.1 (406) of the 2009 Michigan Residential Code. For context, Section G2417 (406) of the 2009 Michigan Residential Code governs inspection, testing, and purging. Section G2417.1 (406.1) states: "Prior to acceptance and initial operation, all *piping* installations shall be inspected and *pressure tested* to determine that the materials, design, fabrication, and installation practices comply with the requirements of this *code*." Section G2417.1.1 (406.1.1) states: "Inspection shall consist of visual examination, during or after manufacture, fabrication, assembly or *pressure tests* as appropriate." The record also contained Section G2401.1 (101.2) of the 2015 Michigan Residential Code, which "covers those fuel gas *piping systems*[.]" In relevant part, the same section stated the "chapter shall not apply to . . . *gas piping*, meters, gas pressure regulators, and other appurtenances used by the serving gas supplier in the distribution of gas. . . ." Section G2403 (202) of the 2015 Michigan Residential Code defines a piping system as "[a]ll fuel *piping*, valves and fittings from the outlet of the *point of delivery* to the outlets of the *appliance* shutoff valves." A point of delivery is "the outlet of the service meter assembly or the outlet of the service regulator[.]"

Consumers Energy argues on appeal the Michigan Residential Code did not apply to its service on the property when it replaced the service line, emphasizing it was not required to pressure test the fuel line because it was downstream from the meter. Consumers Energy also argued, under the Michigan Administrative Code, it was only required to test the meter, which it did by performing a soap test. Rule 51 of the Michigan Administrative Code governs the inspections of meters by utility companies. Mich Admin Code R 460.2351. In pertinent part, this rule states:

(c) A repaired meter or a meter that is removed from service must be leak-tested before being returned to service, subject to the following requirements:

(i) If tested in the field, a meter must be tested at the actual meter operating pressure of the system.

(ii) If tested in the shop, a meter must be subjected to an internal pressure test of, at a minimum, 3.0 pounds per square inch gauge pressure. In addition, any meter that will operate above 3.0 pounds per square inch gauge pressure must be so marked on the meter and must be subjected to 1 of the following tests:

(A) An internal pressure test of, at a minimum, the manufacturer's rated operating pressure.

(B) An internal pressure test at 10% above the maximum operating pressure to which the meter could be subjected.

(C) Any suitable test that is approved by the commission.

(iii) During the pressure test, the meter must be checked for leaks by 1 of the following tests:

(A) Immersion test.

(B) Soap test.

(C) Pressure drop test of a type that is approved by the commission. [Rule 460.2351.]

The company broadly contends it met its statutory duty to test the lines by performing the soap test. It is noted Consumers Energy did not present this argument in the trial court. Moreover, whether various provisions of the Michigan Residential Code and Michigan Administrative Code are applicable, there remains a question of fact regarding the specific standard of care and whether Consumers Energy adequately installed the line and adhered to statutory requirements for inspection. Wood stated the shadow test and soap test were inadequate to test the gas line and the fuel line, maintaining a shadow test merely indicates whether there is a "flow." Wood stated an air pressure test should have been performed on the fuel line. The company asserts, under this Court's opinion in *Tarlea v Crabtree*, 263 Mich App 80, 90; 687 NW2d 333 (2004), Wood only suggests it needed to take certain precautions, which were not required and did not establish negligence. This Court stated: "[S]aying that a defendant could have taken additional precautions is insufficient to find ordinary negligence[.]" *Id*. However, there is a question of fact regarding the specific standard of care and this Court is not in a position to speculate whether certain tests would simply constitute additional precautions.

### 3. CAUSE

"Proximate cause, also known as legal causation, is a legal term of art with a long pedigree in our caselaw." *Ray v Swager*, 501 Mich 52, 63; 903 NW2d 366 (2017). "Proximate cause is an

essential element of a negligence claim. It involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Id*. (quotation marks, footnotes, and citations omitted). "Proximate cause is distinct from cause in fact, also known as factual causation, which requires showing that but for the defendant's actions, the plaintiff's injury would not have occurred." *Id*. (quotation marks, footnotes, and citations omitted). "[A] court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries." *Id*. at 64 (quotation marks, footnotes, and citations omitted). "In a negligence action, a plaintiff must establish both factual causation, i.e., the defendant's conduct in fact caused harm to the plaintiff, and legal causation, i.e., the harm caused to the plaintiff was the general kind of harm the defendant negligently risked." *Id*. (quotation marks, footnotes, and citations omitted). "If factual causation cannot be established, then proximate cause, that is, legal causation, is no longer a relevant issue." *Id*. Proximate cause "requires a determination of whether it was foreseeable that the defendant's conduct could result in harm to the victim." *Id*. at 65. "A proper legal causation inquiry . . . requires determining whether the actor's breach of a duty to the plaintiff was a proximate cause of the plaintiff's injury. It is not uncommon that more than one proximate cause contributes to an injury." *Id*. (footnotes and citations omitted).

There is evidence to suggest the company's performance when replacing the service line created a leak, which led to an explosion, or was a cause in fact of plaintiff's injuries. In other words, a jury could conclude it was more likely than not, but for the company's conduct, plaintiff's injuries would not have occurred.

Buc opined the explosion was caused by butane gas contained in tanks on the property and the leaks in the fuel line were caused by the explosion. Buc tested six butane tanks and found three "had contents." Buc ruled out a natural-gas leak as the cause of the explosion because "[g]as piping from inside the house held pressure[.]" Buc noted butane "ignites more readily" than natural gas and was odorless; the natural gas supplied by the company, however, was "odorized." Buc noted there were no reports of anyone smelling any odors. Buc stated when the explosion happened, "stresses were put on the [fuel line] to the point where it broke at a joint near the meter and was bent." Buc reached her conclusion on the basis of her

> education, training, and professional experience including many other residential gas explosions; [her] review and observations of the Krykun fire scene; pressure testing gas piping from the street to the various appliances in the Krykun home; [her] examination of the condition of the [fuel line] after the meter under the deck to where it entered the home; preliminary calculations based on a low pressure, leak from a small opening in the gas piping under the deck; and basic fire and explosion dynamics. . . .

Miller disagreed that butane was "the probable cause" and, instead, did not rule out natural gas as a cause because there were leaks in the fuel line and "natural gas [was] definitely going to the house." Miller questioned Buc's conclusion, reasoning that damage would have more likely occurred on the "elbows" of the fuel line in the event the explosion had caused the leaks. He noted "there's no proof that there ever was a butane leak," and "no proof that butane was ever inside the house." Miller opined it was "possible" the explosion was caused by a natural-gas leak. Miller did not eliminate butane as the cause, but emphasized the butane tanks were outside the house.

Miller did not know where the source of the gas was located, and whether the gas leak was from indoors or outdoors, but stated there was a "higher probability" natural gas caused the explosion. Miller noted natural gas has an odor, but did not know if there was testing of any odorant "at the time of the accident." Miller stated there was a 3-foot-long section of the fuel line in the furnace room that "could not be tested" because it was "too damaged." Miller explained there was no way to know whether that section of the fuel line leaked before or after the explosion. Miller stated any of the leaks in the fuel line "could have got natural gas into the crawl space" of the house.

Wood was plaintiff's proffered expert and opined the work performed by Consumers Energy's crew in replacing the service line "disturbed the downstream piping system after the meter," and "more likely than not . . . could have caused a [natural] gas leak that created the explosion." Wood reasoned Consumers Energy's line replacement project used "tools on both sides" of the meter and the torque from the "heavy equipment" also "disturbed the piping on the home side." Specifically, the company "went underneath the road with some heavy equipment," "trenched the property line," "dug around the existing meter," and "torqued on the piping systems to manipulate and connect everything together." Wood stated it was "[m]ore likely than not" this work affected the downstream line, emphasizing the "vibration" caused by the air missile. Wood stated it was "conceivable" the missile "could vibrate the gas pipe" because, on the basis of his experience, "an air hammer can be felt a long way away" and "creates tremendous force." Wood opined it would take a "very minimal" amount of torque to crack the downstream line because of the "age" of the pipe. Wood noted "any level of torque might create a leak." Wood stated the "leaks were accelerated and brought to fruition through the work." Wood asserted a gas leak might "not necessarily" have an odor.

Wood was not an expert in metallurgy, engineering, fire causation, accident reconstruction, or gas distribution "upstream of the meter[.]" Wood also did not calculate the vibrations or force caused by the air missile. However, he possessed 50 years of experience "working on corroded pipe." Miller never served as an expert in determining the adequacy of work done by a utility company, but had served as an expert to determine the cause of a natural-gas leak. He was not an expert in engineering, physics, chemistry, gas distribution, gas piping, or metallurgy. Miller did "not do any type of calculations," but possessed "over 30 years of investigating explosions." Miller's opinion was made "within a degree of reasonable scientific certainty[.]" The opinions of Miller and Wood constitute more than mere conjecture or speculation. See *Karbel*, 247 Mich App at 97. Although Consumers Energy supported its position with Buc's report, plaintiff has presented the deposition testimony of Miller and Wood, as well as Miller's notes, which create a question of fact that but for Consumer's Energy's conduct, plaintiff's injuries would have been avoided. See *Quinto* , 451 Mich at 362-363.

### III. CONCLUSION

The trial court erred in granting summary disposition to Consumers Energy. Consumers Energy undertook a duty to inspect the fuel line and, viewing the evidence in a light most favorable to plaintiff, whether it did so with adequate care is a question of fact. There exist questions of fact whether the company caused leaks in the fuel line when it replaced the gas line a month before the explosion, and whether that caused plaintiff's injuries. There is also a question of fact as to the specific standard of care.

Reversed and remanded for further proceedings.  We do not retain jurisdiction.


/s/ Michael J. Riordan
/s/ Adrienne N. Young