**CITIZENS INSURANCE COMPANY OF AMERICA, as subrogee of Timothy and Linda McRoy, and Timothy, Linda, Mitchell, Andrew, and Ryan McRoy, individually, Plaintiffs,**

v.

**SEARS ROEBUCK AND CO., Modern Home Products, Inc., Turco Manufacturing Company, and Sunbeam Corporation, Defendants.**

No. 1:99 CV 453.

United States District Court, W.D. Michigan, Southern Division.

May 3, 2002.

Michael J. Black, Buesser, Black, Graham & Buettner, P.C., Bloomfield Hills, MI, Christopher K. Cooke, Cummings, McClorey, Davis & Acho, P.L.C., Williamsburg, MI, Sheila E. Walsh, Denise L. Mitcham & Associates, Southfield, MI, Richard A. Marvin, Marvin & Associates, Grand Rapids, MI, for Plaintiffs.

Mark D. van der Laan, Dykema Gossett, PLLC, Grand Rapids, MI, Susan W. Sitron, David E. Eason Law Offices, Livonia, MI, for Defendants.

### OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

MILES, Senior District Judge.

In this diversity action removed from Michigan's Kent County Circuit Court, the plaintiffs seek to recover for property damage and personal injuries allegedly arising from a fire which originated in an outdoor barbeque gas grill located at the home of plaintiffs Timothy, Linda, Andrew, Ryan, and Mitchell McRoy (collectively "the McRoys") in Caledonia, Michigan on May 22, 1996. The fire occurred while the grill was being used by Andrew and Ryan McRoy, the 17–year old sons of Timothy and Linda McRoy. The matter is currently before the court on motions filed by defendant Sears, Roebuck and Company ("Sears") and by defendant Modern Home Products ("MHP") for summary judgment (docket nos. 97 and 125). The motions have been opposed by both the McRoys and plaintiff Citizens Insurance Company of America ("Citizens"), which insured the McRoys at the time of the fire and asserts claims as subrogee of the McRoys for the damages covered by Citizens.[1]

For the reasons to follow, the court grants the motions.

### I

Sometime in the late 1970s or early 1980s, Timothy and Linda McRoy acquired an outdoor barbeque grill, Model No. 8825, manufactured by Turco Manufacturing Company ("Turco") of Du Quoin, Illinois. Complaint, ¶s 5, 7. In January, 1993, Sears, through its Sears Repair Service, had serviced the grill, installing a new burner assembly.[2] This replacement part was manufactured by defendant MHP. It is undisputed that while Sears had serviced the Turco grill and provided replacement parts for it, Sears neither manufactured nor sold the appliance, nor did it manufacture the replacement burner assembly which it installed on the grill in January, 1993.[3]

The Owner's Manual provided by Turco with its Model No. 8825 grills included the following cautionary messages, among others:

> After any movement of this grill check burners for proper positioning before relighting. Grill should not be moved while borner [sic] is in operation.

> Minimum horizontal clearance from sides and back of unit to adjacent vertical combustible construction below and extending above top of unit to be 18 inches from back. Do not locate this

---

1. The McRoys have adopted the responses filed by Citizens to both motions.

2. The burner assembly included both burners and venturis. Venturis are the tubes that mix fuel and air and deliver that gas mixture to the burner for combustion. Orifices are the openings through which the grill's gas valve permits the gas to flow into the venturis.

These components are depicted in diagrams contained in the Turco Owner's Manual provided with the grill. Sears' Motion for Summary Judgment, Exhibit H, at 10.

3. Tom Schichtel, a Sears technician, installed the MHP replacement burner and venturis on the McRoy grill on January 14, 1993.

appliance under overhead protected combustible construction.

\* \* \* \* \* \*

Before lighting grill, check to see that venturi is properly seated over orifice on valve.

\* \* \* \* \* \*

**NOTE: TEST FOR LEAKS ANY-TIME POL VALVE IS DISCON-NECTED AND RECONNECTED, SUCH AS REFILLING TANK**

Sears' Motion for Summary Judgment, Exhibit H (Owner's Manual, TURCO Gas Grills, Models 8821, 8822, 8825, and 8826).

Plaintiffs' complaint alleges that in July, 1994 Sears entered into a Maintenance Agreement with the McRoys, under which Sears agreed to maintain and repair a number of appliances then owned by the McRoys, including the Turco grill. Complaint, ¶ 27. Plaintiffs contend that this agreement required Sears to "furnish parts and service necessary to maintain the proper operating condition" of the grill. Plaintiffs also argue that the Maintenance Agreement required Sears to replace the grill if unable to repair it; however, the agreement expressly provided that the obligation to replace merchandise was contingent on Sears' determination that the inability to repair was dependent on "unavailability of functional parts or technical information[.]" It is undisputed that the grill functioned for in excess of three years after Sears replaced the burner assembly in 1993. It therefore cannot be reasonably disputed that Sears fulfilled any contractual obligation it had to the McRoys for repairing the Turco grill.

The plaintiffs allege that sometime before May 22, 1996–the date of the fire-one of the burner venturis became unintentionally disconnected from the orifice spud. Complaint, ¶ 11. The evidence of record which indicates how this could have occurred includes a statement by Andrew McRoy, made shortly after the fire, indicating that sometime before the fire he had either bumped into the grill while attempting to store a tractor, or riding lawnmower, in the area where the grill was also stored. Sears' Motion for Summary Judgment, Exhibit I, at 4, 9. The evidence also indicates that the grill was stored in a patio area which, while technically outdoors, was located underneath a second story sun room, or porch, of the McRoy residence. *Id.,* Exhibit E, at 3. The area was used by the McRoys to store a large amount of personal property, including but not limited to the grill, the riding lawnmower, a Honda motorcycle, sofa swing, and mattresses. This storage area shared two walls of the house and was open to the outside on the other two sides. It had a ceiling approximately eight to nine feet high. Andrew McRoy Dep. at 37–40; Ryan McRoy Dep. at 30.

The evidence also shows that Andrew McRoy had the grill's propane tank filled sometime during the months before the fire. Perhaps it could more correctly be said that he exchanged the grill's empty propane tank for a full tank at a local gas station. In any event, Andrew McRoy testified that he did so by unscrewing the fitting from the hose that leads into the propane tank, and removed the tank, which was not attached in any manner (other than by the hose itself) to the grill. He reconnected the filled tank to the grill hose manually, without the use of tools. Although there was a bracket on the grill which was supposed to connect it to the top of the tank, he did not use that bracket in replacing the tank. Andrew McRoy Dep. at 240–246.

Fire Marshal Tom Spaman was sent to the McRoys to perform an investigation of the scene on May 24, 1996, two days after the fire. When Spaman arrived at the home, he was told that no one had tampered with the scene. Spaman Dep. at 19.

He was able to attribute the origin of the fire to what he called the "porch" or "patio" area under the house. *Id.* at 21, 23. The roof over that area, which served as the floor for the room above, was gone; it had collapsed. *Id.* at 24. Because part of the room above had collapsed, the contents of this collapsed area had to be removed to continue the investigation of the porch or patio area. *Id.* at 27. Ceiling material had come to rest on top of the grill. *Id.* at 54, 55. Spaman recalled finding the grill cover, which was not on the grill and appeared to have broken because of the ceiling over the area, or the floor of the room of above, had fallen on the grill. The gas lines of the tank were gone. *Id.* at 33. The tank itself was not connected in any fashion to the grill pedestal. *Id.* at 44–45, 55. The entire unit was burned. *Id.* at 44. Spaman was able to determine that the point of origin of the fire was the grill and that the cause was accidental, although this did not necessarily mean that the grill malfunctioned. *Id.* at 75–76. He did not determine whether any potential cause of the fire was more probable than not. *Id.* at 76.

During his deposition, Andrew McRoy testified that sometime during the days before the fire, he had "bumped into" or "tap[ped]" the grill with a riding lawnmower when he failed to brake sufficiently while driving the vehicle into the storage area after finishing mowing the lawn. Andrew Ryan Dep., at 47–48. Andrew also indicated that as he and his brother pre-pared to use the grill to cook some steaks on May 22, 1996, Andrew noticed that some internal components of the grill, including the cooking grate, some lava rocks, and a grate on which the lava rocks rested, had been displaced. *Id.*, Exhibit I, at 4–5, 9. Andrew admitted that this displacement had possibly occurred when he bumped into the grill with the riding lawnmower. Andrew Ryan Dep., at 63–64. Andrew testified that he adjusted the grates and lava rocks, but he didn't know whether he actually touched the grill's burners. Andrew McRoy Dep., at 181–185.[4]

As Sears has noted in its reply brief, in his statement given shortly after the fire Andrew McRoy stated that as he was replacing the displaced lava rocks before lighting the grill, he "looked behind where the connecting tubes are. If you look at it there's some screw [inaudible] where I look to see if they're still connected and it looked like they were still connected." Sears Reply, Exhibit K, at 5. This appears to be a direct reference to the venturis, because in the question which preceded this statement, Andrew was asked whether he had adjusted, moved, or touched the burners below the bottom grate. Later in his statement, Andrew again refers to "a hole in the bottom where the two tubes go up to connect to each burner," *Id.* at 6, another apparent reference to the venturis. Plaintiffs have argued that it is "in dispute" whether Andrew looked into an opening at the rear of the grill post which

---

4. The statement which Andrew give shortly after the fire is not entirely consistent with his testimony in this regard. When asked on May 23, 1996 whether he had "jiggle[d] or otherwise adjust[ed] or move[d] or touch[ed] the burners" located below the second grate, Andrew responded, "I had to." Sears' Motion for Summary Judgment, Exhibit I, at 5. However, this discrepancy is not material to the court's basis for its current ruling.

Plaintiffs argue, without citation to the evidence, that "[t]here is no physical evidence on the grill such as dents or dings from the impact with the lawnmower to indicate that the lawnmower did anything more than 'tap' the grill." Plaintiff Citizens' Brief in Opposition to Sears' Motion for Summary Judgment, at 13 n. 1. However, the evidence indicates that the grill suffered extensive damage not only in the fire itself but also when the ceiling over the area where the grill was stored collapsed on the grill during the fire.

would have allowed him to observe the venturis in place, but they argue that this fact "is of limited importance." Citizens' Brief in Opposition to Sears' Motion for Summary Judgment, at 14. To the contrary, however, it is of a great deal of importance to plaintiffs' theory of the case-which requires dislodgement to have caused the fire-whether the venturis appeared to be connected before the fire started. After making the adjustment, Andrew started the grill, observed that it appeared to be operating, and then walked away, either to obtain items from the kitchen or to talk to his brother Ryan (who had gone to get items from the kitchen). By the time they returned to the area where the grill was located, the fire was underway. Neither boy saw the fire start.

Plaintiff Timothy McRoy was not home at the time of the fire. Plaintiff Linda McRoy was at home; she was the one who apparently phoned for help upon being informed of the fire by her sons. The evidence indicates that use of the Turco grill had been relegated to the storage area of the McRoy home and to the McRoy children after the family had purchased a newer grill. The evidence also indicates that after January, 1993, when a Sears technician installed the replacement burner assembly manufactured by MHP, Sears technicians had responded to the McRoys' service requests related to the grill in August, 1993 and in November, 1993. In August, 1993, a Sears technician installed new cooking grids, lava rocks,

and an electrode on the grill, and had also cleaned the burner assembly. In November, 1993 another Sears technician had checked and cleaned the McRoys' grill at the request of the McRoys.[5] It is undisputed that after this November, 1993 maintenance, the grill was fully operational. The McRoys have not identified any problems they experienced with the grill between November, 1993 and May 22, 1996, the date of the fire—at least none which were sufficient to cause them to seek repairs; it is undisputed that the McRoys made no requests of Sears for further service on nor did they report to Sears any problems with their Turco grill after November, 1993 and through the date of the fire.[6]

The plaintiffs' theory of how the fire originated is documented in their pleadings, in which they allege that liquid propane ("LP") gas "flowed into the burner pot from the area where the orifice spud became disconnected from the grill. This collection of LP gas was subsequently ignited, causing a raging fire emanating from the grill." Complaint, ¶ 12. Though originating in the grill, the fire spread to the exterior of the McRoy's home before the fire department was able to extinguish the blaze. The fire caused in excess of $700,000 in damages to the home and its contents. Plaintiff Citizens, which insured the residence, paid the McRoys in excess of $750,000 for losses caused by the fire.

---

**5.** Plaintiffs argue that in November, 1993, Linda McRoy had reported to Sears that the grill had "almost blown up." Plaintiff Citizens' Brief in Opposition to Sears' Motion for Summary Judgment, at 12. However, while this "almost blown up" statement is represented in briefing as a direct quote, no citation to the evidence is provided for the "quote." In addition, plaintiffs have not elaborated on what they mean by "almost blown up."

**6.** For some reason, in Count III of their complaint the plaintiffs allege breach of the July, 1994 Maintenance Agreement into which they entered with Sears, covering the Turco grill. Complaint, ¶ s 8, 27. However, because they have provided no evidence that the McRoys ever requested service on the grill after November, 1993, it is unclear why the plaintiffs believe that the 1994 agreement figures prominently in this lawsuit.

## II

On or about May 19, 1999, Citizens, acting as subrogee of Timothy and Linda McRoy, filed this action in Michigan's Kent County Circuit Court, seeking recovery of the amount of insurance policy proceeds paid for the losses incurred in the fire. The McRoys joined in the complaint as individual plaintiffs, seeking recovery for damages to real and personal property allegedly sustained in the fire which exceeded the limits of the Citizens' policy, as well as incidental, consequential, and exemplary damages for embarrassment, fright, shock, humiliation, outrage, and indignity.[7] The claims asserted in the complaint include the following: (1) ordinary negligence (Count I), gross negligence (Count II), and breach of contract (Count III), against Sears; (2) product liability (Count IV), breach of the implied warranties of merchantability and fitness (Counts V and VI), and negligence (Count VII) against MHP; and (3) product liability (Count VIII) and breach of implied warranty of merchantability (Count IX), against Turco. Sears filed a timely Notice of Removal.

Though named as a defendant by the plaintiffs, Turco is no longer a party. By order entered on November 2, 1999, the court dismissed plaintiffs' claims against Turco without prejudice for lack of timely service. Apparently, plaintiffs never served Turco because that company is now defunct.[8]

Plaintiffs' complaint also alleged that sometime after the manufacture of the grill in question, another defendant, Sunbeam Corporation ("Sunbeam") purchased the assets of Turco. Complaint, ¶ 6. Sunbeam, plaintiffs alleged, was a "continuation of the Turco enterprise" and therefore had successor liability for damages caused by Turco's product. Much earlier in the action, Sunbeam filed a Motion for Summary Judgment (docket no. 38), arguing that it did not have successor liability as alleged by the plaintiffs. The plaintiffs never filed any written response to Sunbeam's motion, and the court concluded that Sunbeam was correct that successor liability did not apply under the circumstances. The court issued an order granting Sunbeam's motion. Therefore, like Turco, Sunbeam has been dismissed from this action. However, unlike the dismissal of Turco, which was without prejudice for lack of timely service, the dismissal as to Sunbeam is with prejudice.

## III

In its motion (as supplemented after the completion of discovery), Sears seeks summary judgment in its favor, arguing both that it had no duty as a matter of law to

7. Plaintiffs also seek damages allegedly sustained by Andrew McRoy based on the fright caused by the fire. Although they allege that his distress has caused a condition which has manifested itself physically, plaintiffs do not allege that any of the McRoys was burned or otherwise physically injured in the fire.

8. In their claims against Turco, plaintiffs alleged that grill Model No. 8825 was not reasonably safe at the time it left control of Turco because (1) Turco failed to equip the original burner with tie downs or other means of securing the burner in such a fashion that the burner venturis would not become dislodged from the orifice spud, thereby causing the unintended release of LP gas into the grill pot; (2) Turco failed to warn repairers of the grill that tie downs must be used; and (3) Turco failed to warn installers of replacement burners that appropriate tie downs or other means of securing the replacement burner should be used so that the burner venturis did not become unintentionally disconnected from the orifice. Complaint, ¶ 54. However, plaintiffs have abandoned these claims against the now-defunct Turco not only procedurally, but also in substance; as the court notes below, plaintiffs now argue that the grill, as originally supplied by Turco, conformed with the then-prevailing industry standards.

equip the Turco grill with post-market safety mechanisms, and that the plaintiffs cannot establish that any conduct by Sears caused the 1996 fire. In its motion, MHP adopts the position of Sears, but supplements that position by arguing that plaintiffs cannot establish either a breach of Michigan's product liability statute or a breach of warranty claim. Sears also argues (1) that plaintiffs cannot succeed on a gross negligence claim because this is no longer a viable cause of action under Michigan law; (2) that Sears did not breach any contract with the McRoys; and (3) in any event, plaintiffs' breach of contract claim is time-barred.

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In evaluating a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the burden of establishing the non-existence of any genuine issue of material fact and may satisfy this burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that par-ty's case, and on which that party will bear the burden of proof at trial." *Id.* at 322–323, 106 S.Ct. 2548. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* Only factual disputes which may have an effect on the outcome of a lawsuit under the applicable substantive law are "material." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Sears has taken some rather unusual, though certainly not unique procedural steps in connection with the filing of its motion for summary judgment. First, Sears moved for leave to file its motion under seal. Although the motion raised no issues of damages or comparative negligence, and although credibility issues play no part in such motions, Sears has included in its briefing (by way of an ostensible introduction to the McRoy family) certain statements about personal and family problems experienced by the McRoys, in particular Andrew (who is now no longer a minor). Sears' exhibits have also included "confidential" testimony about these same issues, utterly irrelevant to the resolution of its motion. At some point in an action, these matters may become highly relevant but they aren't now.

In a supplement to its motion filed after the close of discovery, Sears also indicated that more was to come, promising that it was "preparing motions to strike the testimony of plaintiffs' experts." Supplementary Brief in Support of Motion for Summary Judgment, at 11. Ultimately, Sears fulfilled this promise, and more, by filing four separate motions to exclude the testimony of plaintiffs' experts Michael Kroll, Charles Krosp, Dan McVickar, and Dan Jones. Later, apparently not content with what it had already filed seeking exclusion

of experts, Sears also filed yet another "Motion to Strike Plaintiffs' Cumulative Experts." The idea behind this later effort was apparently that, should the court deny one or more of Sears' motions to strike the individual experts, Sears would alternatively have the court limit plaintiffs to no more than one cause and origin expert, and exclude all other expert testimony offered by plaintiffs on the cause and origin of the McRoys' 1996 fire.

Sears and MHP have also joined forces in filing a separate "Joint Motion for Sanctions for Plaintiffs' Spoilation of Evidence." Arguing that evidence indicates that plaintiffs' agents—either their experts or their counsel—altered fire scene evidence and/or grill artifacts, Sears and MHP contend that plaintiffs' case should be dismissed or, alternatively, plaintiffs should be sanctioned by having this evidence or opinion testimony derived from it excluded.

The multiple motions directed to plaintiffs' experts appear to reflect a defense strategy of attempting to win on summary judgment, or at trial, by excluding witnesses or evidence plaintiffs intend to offer. The McRoys, having apparently caught on to this strategy, have recently filed their own motion to exclude testimony of proposed defense expert Carl Suchovsky. While zealous advocacy is one thing, in some respects the sheer amount of paperwork filed in this case has begun to take on the appearance of disproportionality. This is unfortunate, for the action is really a simple one.

### IV

■ The parties have assumed that Michigan law applies in this diversity action. In a Michigan products liability action, there are four elements: (1) the existence of a legal duty by defendant toward plaintiff; (2) breach of that duty; (3) proximate causal relation between the breach of that duty and an injury to the plaintiff; and (4) damages suffered by the plaintiff. *Gross v. General Motors Corp.,* 448 Mich. 147, 528 N.W.2d 707, 714 (1995).

■ Under Michigan law, the question of duty is one of law for the court to decide. *Davis v. McCourt,* 226 F.3d 506, 511 (6th Cir.2000); *Foster v. Cone–Blanchard Machine Co.,* 460 Mich. 696, 597 N.W.2d 506, 512 (1999); *Gregory v. Cincinnati Inc.,* 450 Mich. 1, 538 N.W.2d 325, 330 (1995); *Moning v. Alfono,* 400 Mich. 425, 436–37, 254 N.W.2d 759, 765 (1977); *see Glittenberg v. Doughboy Recreational Indus.,* 441 Mich. 379, 491 N.W.2d 208, 212 n. 11 (1992). In the court's view, it makes sense to first examine whether either Sears or MHP owed a duty to the plaintiffs, for if not, the remaining issues become irrelevant.

■ Michigan courts have refused to impose a postmanufacture duty to retrofit a product. *Gregory v. Cincinnati Inc.,* 538 N.W.2d at 333–34. According to the Michigan Supreme Court, "[f]ocusing on postmanufacture conduct in a negligent design case improperly shifts the focus from point-of-manufacture conduct and considers postmanufacture conduct and technology that accordingly has the potential to taint a jury's verdict regarding a defect." *Id.,* 538 N.W.2d at 334. "Under Michigan law, the time of manufacture is the relevant point for determining the state of existing technology." *Christ v. Sears, Roebuck & Co.,* No. 97–1768, 1998 WL 344049, at *2, 149 F.3d 1182 (6th Cir.1998). In addition, under Michigan law, "a component part supplier has no duty, independent of the completed product manufacturer, to analyze the design of the completed product which incorporates its nondefective component part." *Childress v. Gresen Manufacturing Co.,* 888 F.2d 45, 49 (6th Cir.1989). Absent a defect in the component part itself, a compo-

nent part manufacturer has no duty arising from the application of the part in a completed product. Stated another way,

> 'The obligation that generates the duty to avoid injury to another which is reasonably foreseeable does not-at least not yet-extend to the anticipation of how manufactured components not in and of themselves dangerous or defective can become potentially dangerous dependent upon the nature of their integration into a unit designed, assembled, installed, and sold by another.'

*Id.* (quoting *Jordan v. Whiting Corp.,* 49 Mich.App. 481, 212 N.W.2d 324 (1973), *rev'd in part on other grounds,* 396 Mich. 145, 240 N.W.2d 468 (1976)).

Here, the duties of a component part manufacturer are highly relevant, because it is undisputed that neither MHP nor Sears designed, manufactured, or sold the original grill purchased by the McRoys. Plaintiffs themselves now concede that the grill, as originally manufactured, conformed with industry safety standards. *See* Plaintiff Citizens' Brief in Opposition to MHP's Motion for Summary Judgment, at 1–2 ("At the time the grill left Turco's control, it was in conformity with industry standards, since the grill was equipped with a means of containment of the burner assembly, by virtue of fixed feet on the burner which were secured by the slots in the grill pot. Venturi tubes were also provided by Turco which precisely fit straight down over the two gas orifices of the burner valves. As designed, Turco's venturi tubes provided additional support against an impact to the grill which could disengage the burner assembly. Turco also provided a cast iron burner, which provided additional weight to better hold the burner assembly in place"); Plaintiff Citizens' Brief in Opposition to Sears' Motion for Summary Judgment, at 4 ("There is no evidence to suggest that the Turco grill, as supplied by the manufacturer, did not conform to prevailing industry standards"). Because Turco's original burner design did not incorporate a fastener mechanism, the burner and venturi assembly could become dislodged from the orifice if the grill were significantly bumped or tipped over. The warnings provided by Turco in its Owner's Manual confirm that the company was indeed aware of this and therefore took active steps to warn grill owners of this possible occurrence.

As applied to MHP, Michigan law imposes no duty to supply a grill component which makes the grill safer than it was when the grill was originally manufactured. Plaintiffs' position, however, is that MHP made the Turco grill less safe by supplying a replacement component which was less safe than its original counterpart insofar as the replacement burner could *more easily* become dislodged if bumped or tipped over given its lighter weight (the original burner was cast iron, the replacement burner was made of stainless steel) and given its somewhat different fit than the original burner. Such a situation, involving use of a component not supplied by the original manufacturer and added subsequent to distribution, would not give rise to liability on Turco's part. *See Spencer v. Ford Motor Co.,* 141 Mich.App. 356, 367 N.W.2d 393, 396 (1985) (truck manufacturer could not be held liable for wheel rim component added subsequent to distribution of vehicle). If the original manufacturer is not liable because its product can accommodate dangerous or defective replacement components manufactured by another, then who is liable in this situation? The obvious answer is that the manufacturer of the replacement component may be held liable, provided that the plaintiff is able to establish the remaining required elements.

■ As a supplier of replacement grill components, MHP clearly had a duty to ensure that its parts were reasonably safe

for use as specified. Here, MHP does not deny that the replacement burner was specified for use in the McRoys' Turco grill. Plaintiffs argue that MHP's replacement burner did not comply with applicable industry standards, which required burners to be secured against side-to-side or front-to-back displacement. However, assuming that movement of the burner assembly—such as being struck by a riding lawnmower—in fact caused the McRoys' fire, plaintiffs still face the hurdle of establishing, in accordance with the standards on which they rely,[9] that the replacement burner would have failed the method of test specified in the allegedly applicable standard and that this type of failure in fact caused the fire and the plaintiffs' damages.

█ For example, a 1993 standard on which plaintiffs rely requires as follows:

> The burner(s) shall not become permanently displaced after being subjected to a force equal to two times the weight of the burner-venturi assembly (or 25 pounds (11.3 kg), whichever is less) applied to each burner assembly in turn in all directions which could result in burner displacement.

Plaintiff Citizens' Brief in Opposition to Sears' Motion for Summary Judgment, Exhibit B.[10] Because plaintiffs have not shown that any testing has been conducted on exemplar grills and/or replacement burners, they have not shown that a genuine issue of material fact remains regarding whether MHP's design failed to comply with industry standards and therefore

breached the company's duty to supply a burner which was reasonably safe for its intended use.

█ Because the same standards presumably applied to Sears, as the installer of the replacement burner assembly, plaintiffs proofs likewise fail as to that defendant as well. Assuming that Sears had a duty, as a service provider, to supply the McRoys with parts for their grill which were not defective, plaintiffs have failed to show that the Turco grill, as repaired by Sears with a new burner assembly, could not withstand the testing requirements of the ANSI standards. Even though such standards are not necessarily controlling, it is plaintiffs themselves who rely on them here in seeking to hold these defendants liable for supplying the replacement part.

█ Plaintiffs have likewise failed to show that Sears was negligent in servicing the grill. This is not a situation in which the grill failed soon after being repaired. *See Gadde v. Michigan Consolidated Gas Co.*, 377 Mich. 117, 139 N.W.2d 722, 727 (1966) (circumstantial evidence and inferences supported finding of negligence, where gas oven exploded hours after serviceman left plaintiff's premises and substantial gas leak was found on following day); *Firemens Mutual Ins. Co. v. Muskovitz & Pershin & Sons, Inc.*, 32 Mich. App. 566, 189 N.W.2d 85, 86–88 (1971) (explosion which occurred hours after servicemen left provided circumstantial evidence of negligence); *see also Piper v. Tensor Corp.*, 71 Mich.App. 658, 248 N.W.2d 659, 663 (1976) (unnecessary for

---

**9.** In its Brief in Opposition to MHP's Motion for Summary Judgment, Citizens equates the standards on which it relies, promulgated by the American National Standards Institute ("ANSI"), to federal government standards. *Id.* at 3, 4. However, as MHP has correctly noted in its reply, the ANSI standards are not federally promulgated standards.

**10.** The court is aware that the defendants have taken the position that any evidence relating to grill industry standards dated after the purchase and installment of the replacement burner are irrelevant, given Michigan law's requirement that any standards relate to the point of manufacture and not to post-manufacture. However, the court is utilizing the standard proposed by plaintiffs merely for purposes of resolving the present motions.

plaintiff to offer expert testimony specifying exact theory as to cause of fire; showing that lamp, manufactured and repaired by defendant, caught fire soon after being repaired by defendant was sufficient circumstantial evidence to raise ,inference that defendant had breached implied warranty and was negligent in designing lamp). The grill performed adequately for over three years after replacement of the burner assembly, and for approximately two and one-half years after the most recent service requested by the McRoys. There is simply no evidence, circumstantial or otherwise, indicating that Sears either breached its agreement with the McRoys or that it was negligent in its repair of the grill.

Plaintiffs make much of the fact that the replacement burner assembly supplied by Sears did not come equipped with "tie downs" to keep the components in place. There is no dispute that the particular replacement burner and venturis were not sold with any tie downs or other mechanism to secure the burner to the grill. MHP did not sell such .devices with its burner kits nor did it provide any instructions requiring installation of such devices. However, the Turco grill, as originally manufactured, did not include a tie down or other mechanism to *secure* the burner to the grill. The industry standards did not require tie downs; they merely re-

quired that the design be able to withstand a specified amount of force. Under the circumstances, Sears was not obliged to provide a tie down, nor was Sears obliged to warn the plaintiffs that such a mechanism was not being provided.

 Plaintiffs also argue that the defendants were required to exercise a higher degree of care because propane gas is a dangerous agency. It is true that gas "has long been regarded as ·a dangerous substance." *Gadde*, 377 Mich. 117, 139 N.W.2d at 726. However, saying that the defendants owed plaintiffs a ."higher degree of care" (Citizens' Brief in Opposition to MHP's Motion for Summary Judgment, at 2, citing *St. Paul Fire and Marine Ins. Co. v. Michigan Consolidated Gas Co.*, 4 Mich.App. 56, 143 N.W.2d 801, 805 (1966)) does not state the entirety of the standard. Instead, the Michigan Supreme Court has held that "[a]nyone ·dealing with· this commodity [gas], because of its dangerous propensities, must exercise such care for the safety of others as a reasonably prudent man would exercise in the face of such potential danger." *Gadde*, 139 N.W.2d at 726; *see St. Paul Fire and Marine v. Michigan Consolidated Gas*, 143 N.W.2d at 805 ("No absolute standard can be fixed by law but every reasonable precaution suggested by experience and the known danger ought to be taken") (citation omitted).[11] No evidence suggests that Sears

---

11. While "Michigan courts have traditionally imposed on the suppliers of dangerous commodities a high standard of care in supplying those commodities-a standard commensurate with the danger of the product ... no Michigan court has imposed on such a supplier a duty to unilaterally inspect lines, conduits, and appliances over which it has no control." *Girvan v. Fuelgas Co.*, 238 Mich.App. 703, 607 N.W.2d 116, 121 (1999). "The duty imposed on the supplier of a dangerous commodity to inspect interior lines, conduits, and appliances on the premises of an end user should be limited to those situations where the supplier has expressly agreed to enter the user's premises for the purpose of making an in-

spection, modification, or repair." *Id.*, 607 N.W.2d at 121–22. Here, Sears was not a supplier of gas, but· rather a servicer of a gas outdoor cooking grill, and its obligation, per its agreement with the McRoys, extended to performance of an annual preventive maintenance check-up on the grill "[o]nce each year of coverage, at [plaintiffs'] request." Citizens' Brief in Opposition to Sears' Motion for Summary Judgment, Exhibit E. Here, as noted above, there is no evidence that the McRoys had requested that Sears perform service on the grill since 1993. There is also no evidence that the McRoys requested that Sears perform an annual preventive maintenance

failed to act as a reasonably prudent servicer of the gas grill, where it responded to requests for maintenance and/or service by the McRoys, the grill functioned as expected thereafter, and the McRoys made no further complaints regarding the grill even though they continued to use it for years thereafter.

Even assuming that plaintiffs can establish some breach of duty by either Sears or MHP, plaintiffs must still overcome the hurdle of establishing causation with the evidence as it existed after the fire. "It is well settled under Michigan law that a prima facie case for products liability requires proof of a causal connection between an established defect and injury." *Skinner v. Square D. Co.*, 445 Mich. 153, 516 N.W.2d 475, 478 (1994). Proving cause actually requires proof of two separate elements: (1) cause in fact, and (2) legal cause, also known as proximate cause. *Id.*, 516 N.W.2d at 479. However, the latter only becomes a relevant issue once the plaintiff adequately establishes cause in fact. *Id.*

"While plaintiffs may show causation circumstantially, the mere happening of an unwitnessed mishap neither eliminates nor reduces a plaintiff's duty to effectively demonstrate causation[.]" *Id.* at 480. "To be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." *Id.* At a minimum, the plaintiffs' causation theory must have some basis in established fact-but this in itself is not sufficient. It is not enough to withstand summary judgment

To submit a causation theory that, while factually supported, is, at best,

just as possible as another theory. Rather, the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred. *Id.*

The issue of causation is critical in this case. No one disputes that the fire originated in the grill. However, in order to withstand summary judgment with respect to either MHP or Sears, plaintiffs must establish that a genuine issue remains regarding whether their theory of how the fire started—in the burner—is more likely than not the cause of the fire. Plaintiffs argue that their expert, Charles Krosp, located burn patterns on the grill's venturis which indicate that these tubes were not in place at the time of the fire. For all of his talk of "burn patterns," however, Krosp's testimony does not indicate whether these patterns could have been produced by the impact of the burning ceiling falling on the grill. Even more important, however, is the fact that not one of plaintiffs' experts-and there are many of them-is able to rule out other possible causes of the fire.

While no conclusive evidence establishes that either of the grill's venturis was dislodged at the time the fire started, it is possible that this had occurred when the grill was struck with the riding lawnmower. However, this evidence also permits the inference that the impact of the riding lawnmower was sufficient to displace the grates and lava rocks which Andrew had to adjust immediately before the fire. This circumstantial evidence supports the

on the grill in the three years before the fire. Under the circumstances, there is no evidence that Sears had notice of any dangerous condition presented by the grill at the time of the fire. *Cf. St. Paul Fire and Marine Ins. Co. v. Michigan Consolidated Gas Co.*, 4 Mich.App.

56, 143 N.W.2d 801, 805 (1966) (gas company liable for damages caused by explosion of gas water heater, where defendant was notified that gas did not shut off and water was excessively hot, but defendant failed to replace thermostat or shut off gas).

inference that other elements of the grill-including elements of the burner assembly-were displaced at the time of the fire. However, the key difficulty is that this same evidence which permits the inference that elements of the burner assembly might have been displaced also permits the inference that other elements of the grill might have been displaced or even damaged immediately before the fire. These elements include the grill's gas line and regulator, which were irretrievably destroyed in the fire. Without examination of these parts, other likely causes of the fire, apart from the burner assembly, cannot be excluded.

Plaintiffs argue that Krosp was "able to rule out the possibility" that certain burn patterns which he claims are present on the venturis could have been caused after the fire had already originated, such as by debris falling on the grill from the collapsed ceiling. Citizens' Brief in Opposition to Sears' Motion for Summary Judgment, at 20. However, the deposition transcript pages to which they cite in support of this argument are ambiguous at

best, and at worst indicate that Krosp was not able to determine how the burn patterns could have been impacted by falling debris, either burning or otherwise. Mr. Krosp at one point admits that the burn patterns which he allegedly observed would be consistent with a venturi being displaced from its orifice "[a]t, during, or before or after" the fire. Krosp Dep. at 134. It appears that there are a number of unknown factors-such as when the collapse occurred, how long the fire continued to burn after the collapse, the amount of fuel left in the tank-which would impact on the possible answer to this question.[12]

▮ In an apparent last-ditch effort to exclude what they now recognize is another potential cause of the fire, plaintiffs have submitted an affidavit of one of their experts, Michael Kroll, who now states that he has examined the fitting attached to the McRoy gas tank and, in his opinion, it was tightened with a tool before the fire and was still tight when he examined it shortly after the fire. Citizens' Brief in Opposition to Sears' Motion for Summary

12. As noted above, Sears and MHP have filed a separate "Joint Motion for Sanctions for Spoilation of Evidence" (docket no. 151), seeking dismissal of plaintiffs' action or, alternatively, exclusion of testimony of plaintiffs' experts based on the post-fire or present configuration of the grill's venturis. The motion is based on what Sears and MHP argue is evidence indicating that the condition of the grill has been altered or otherwise changed since the fire. Although that motion remains pending, the court notes that plaintiffs have conceded, in their response to the motion, that there is evidence that "orientation" of some parts of the grill "has not remained constant." Citizens' Response to Joint Motion for Spoilation Sanctions, at 7. Of course, any changes in the condition of the grill post-fire, whether intentionally made or not, could well impact on the admissibility of this physical evidence as well as on any testimony based thereon. *See United States v. Allen,* 106 F.3d 695, 700 (6th Cir.1997) (physical evidence admissible when possibilities of altera-

tion are eliminated as a matter of reasonable probability); *Transclean Corp. v. Bridgewood Services, Inc.,* 77 F.Supp.2d 1045, 1073 (D.Minn.1999) ("chain of custody" rule requires a showing that evidence is in substantially the same condition as it was during the relevant period of time); *see also* McCormick on Evidence, § 212 (5th ed.1999) (objects offered as having played a direct role in an incident require, as adequate foundation, testimony that the object *is* the object involved in the incident and further "that the condition of the object is substantially unchanged"; if offered evidence is susceptible to alteration, "sound exercise of the trial court's discretion may require a substantially more elaborate foundation"); 7 Wigmore, Evidence § 2129 (Chadbourn rev.1978) (object, when offered, is not relevant unless it was in fact associated with known conditions; principle of authentication "requires that some evidence connecting the object with those conditions be introduced either before or at the time of offering the object itself").

Judgment, Exhibit Q. Mr. Kroll's opinion that a tool was used to tighten the connection seems to contradict Andrew McRoy's testimony that he did not use a tool, but, ignoring this discrepancy for the moment, the court will assume that the connection was sufficiently tight to eliminate this as a cause of the fire.[13] Even still, plaintiffs have failed to submit evidence tending to eliminate the grill's hose and regulator as causes of the fire.

According to Kroll, outdoor gas grills typically come with a mechanical attachment which holds the gas tank in place, so that the hose through which the gas flows is not being stretched. This is important because stretching the hose could cause a rupture, which could release gas, creating a fire hazard. However, Mr. Kroll was not able to observe the hose because it was destroyed in the fire. The regulator, which reduces the gas pressure from the tank to the pressure utilized by the grill, was also melted in the fire. Kroll Dep. at 186–189. To quote Mr. Kroll, the regulator and hose "weren't available for, to rule in or out" as possible causes of the fire. *Id.* at 191.

Unfortunately, what plaintiffs have done through their use of experts is attempt to substantiate their theory of causation, one which might implicate MHP and/or Sears. However, what plaintiffs must also do, and what the pending motions show that they failed to do, is to present evidence indicating that, *more likely than not*, the fire occurred in that manner. The defendants' motions show that plaintiffs' proofs do not negate other potential causes of a fire which might come into play after an out-door gas barbecue grill is "tapped" or struck by a riding lawnmower.

## V

The defendants have raised additional arguments in their motions. However, because plaintiffs' proofs regarding causation fail, the court finds it unnecessary to address these additional arguments. The courts grants the defendants' motions for summary judgment.

## JUDGMENT

In accordance with the Opinion and Order on Motions for Summary Judgment entered on this date as to defendants Sears Roebuck & Company and Modern Home Products, Inc., and in accordance with the Opinion and Order granting defendant Sunbeam Corporation's Motion for Summary Judgment entered on October 4, 2000,

IT IS ORDERED AND ADJUDGED that defendants Sears Roebuck & Co., Modern Home Products, Inc., and Sunbeam Corporation are entitled to summary judgment, and that plaintiffs shall take nothing. Costs shall be taxed in favor of the defendants as provided by law.

---

**13.** During his deposition, Mr. Kroll himself testified that although he had looked at the threaded fitting, he had not tested it or torqued it; in Kroll's words, "That's not been touched." Kroll Dep. at 189–190. Mr. Kroll gave his deposition on May 18, 2001. His affidavit is dated February 11, 2002, long after the defendants filed their motions for summary judgment. "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [the] earlier deposition testimony." *Reid v. Sears, Roebuck and Co., 790 F.2d 453, 460 (6th Cir.1986).*